## UNITED STATES, COMPLAINANT, *v.* CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS AND OTHERS, RESPONDENTS.

PRACTICE—DONEE OF FUND—PARTIES—INTERVENTION—In proceedings to forfeit and escheat to the United States certain real estate whose proceeds are directed by law to be applied to the use and benefit of the common schools of the Territory of Utah, such common schools have not such an interest in such property as to enable them to intervene in the action either to protect the fund or to reclaim certain real estate or to obtain the proceeds of certain real estate converted by the Receiver of the fund by way of compromise into personal property.

In the matter of an original application in the Supreme Court of certain school trustees in Salt Lake County, Utah Territory, to be allowed to intervene in this action. The facts out of which this action arose are as follows:

Section 3, Anti-Polygamy Act of 1862, provided: "That it shall not be lawful for any corporation or association for religious or charitable purposes to acquire or hold real estate in any Territory of the United States during the existence of the Territorial Government of a greater value

than fifty thousand dollars; and all real estate acquired or held by any such corporation or association contrary to the provisions of this act shall be forfeited and escheated to the United States; provided, that existing vested rights in real estate shall not be impaired by the provisions of this section."

Sec. 13 Edmunds-Tucker Law, March 3, 1887, provided: "That it shall be the duty of the Attorney General of the United States to institute and prosecute proceedings to forfeit and escheat to the United States the property of corporations obtained or held in violation" of section 3 last quoted; "and all such property so forfeited and escheated to the United States shall be disposed of by the Secretary of the Interior, *and the proceeds thereof applied to the use and benefit of the common schools in the Territory in which such property may be;* provided, that no building or grounds appurtenant thereto, which is held and occupied exclusively for purposes of the worship of God, or parsonage connected therewith, or burial grounds, shall be forfeited."

Sec. 17 of the same act provided for the annulling of the laws incorporating the Mormon Church, dissolved the corporation and directed the Attorney General to institute proceedings to wind up the affairs of such corporation conformably to law.

Proceedings were instituted in the Supreme Court of the Territory for the purposes contemplated by the act. Arguments were had upon the constitutionality of the above laws, and they were upheld and a Receiver appointed. (See opinion, 5 Utah 361.)   Subsequently Frank H. Dyer, United States Marshal of Utah Territory was appointed Receiver, from the order appointing whom Zane, C. J., dissented on the grounds that he was not a proper man and his governmental office would interfere with his duties.    The Receiver under the order was directed to take possession of all the property of the church.   He began his work by taking possession of certain real estate in Salt Lake County, and by instituting suits for the recovery of certain real estate in Weber County, and by taking possession of about 33,000 sheep.   On July 9th, 1888, the

Receiver filed a petition in the Supreme Court in which he with his attorneys P. L. Williams and George S. Peters United States Attorney for Utah, represented to the Court that certain real estate in Salt Lake City was the property of the church at the time the Edmunds-Tucker law was passed, and that he had instituted suits for its recovery; that the defendants therein had answered setting up a title by purchase, and had now offered to compromise by paying to the Receiver the amount they had paid for the property, and asking that such compromise be permitted. The Receiver was authorized by the Court to make such compromise. At the same time the Receiver made a compromise by which he took seventy-five thousand dollars for all the personal property of the church, and it was understood by the attorneys for the church that this amount was in final settlement of all the property of the church; but this other compromise was not reported to the Court. On October 6th, 1888, the accounts of the Receiver were referred to the Clerk of the Supreme Court, Ezra T. Sprague, to audit the accounts and expenses, and to take testimony and report conclusions as to the amount to be allowed the Receiver for his expenses, and the compensation for himself and his attorneys. On October 8th, 1888, final decree was made in the original action finding certain property therein named, consisting of the real estate theretofore taken to have been the property of the church, and containing no reservation as to property not yet found or taken possession of. Subsequently the said Ezra T. Sprague took testimony in regard to the matters referred to him. Mr. LeGrand Young and Messrs. Sheeks and Rawlins appeared for the church. Mr. Peters and Mr P. L. Williams appeared for the Receiver and examined witnesses for him. On the first day the attorneys for the church cross-examined the witnesses introduced by the Receiver. The Receiver himself testified and introduced witnesses to show that the services rendered by him were worth at least twenty-five thousand dollars and the services of his two lawyers each ten thousand dollars. The cross-examination tended to develop the fact that the Receiver had done but little work, but that it had been done by his

attorneys. But on the next evening the attorneys for the church stated that they had been instructed by their client not to oppose the claims of the Receiver and his attorneys. Mr. Dyer was called and testified: "I have thought I was entitled to twenty-five thousand dollars. I gave notice to the defendants of the amount of my claim. They said they would not oppose that amount. Mr. Peters has declined to agree to that amount on behalf of the government." Mr. Rawlins then asked who represented the government in this proceeding, and whether or not the government had been notified. The Examiner said that he assumed the government had been notified, from the fact that Mr. Peters, besides being a representative of Mr. Dyer was a representative of the government. Mr. Sheeks said "the government is entitled to be here." Mr. Rawlins stated "we were instructed to-day, or given to understand, that our clients had instructed Mr. Young and Mr. Richards to notify Mr. Dyer in writing that his demand for $25,000 would not be objected to. Mr. Sheeks asked Mr. Peters whether he represented the government on this hearing. Mr. Peters replied: "Well, I do to a certain extent, yes." Mr. Sheeks: "To what extent, Mr. Peters?" Mr. Peters: "Well, I don't know." Mr. Sheeks repeated his question but Mr. Peters simply replied that he was here to attend this examination. Mr. Rawlins then said: "We would like to know now if it is understood that $25,000 was the extent of the claim for compensation of the Receiver." Mr. Peters replied: "That is what he says. He is the man that is making the claim."

Mr. Rawlins and Mr. Sheeks then disclaimed all idea of conceding that the claim of the Receiver was reasonable, but said that they acted in obedience to instructions. But they insisted that the government as the custodian of the fund ought to be represented, when it was proposed to take so large an amount from the fund. Thereupon the examination proceeded without any cross-examination or any testimony given except that of the Receiver and his witnesses.

On the 28th day of November, certain School Trustees, through *Messrs. Zane and Zane*, presented to the Court a

petition, which alleged that the petitioners were school trustees of certain common schools, authorized to receive, use, hold, and expend all moneys and proceeds to be expended for their common schools; that the Receiver had in his possession certain real estate, the proceeds of which were to be applied to the common schools ; that such real estate had been rented and the proceeds thereof ought to be applied to the common schools ; that the suits instituted for the recovery of certain other tracts of real estate had been compromised for the sum of $84,666.15, upon recommendations and representations of the Receiver and his attorneys; that such real estate was in reality worth $225,000, and that the Court had been misled in permitting such compromise ; that the compromise should be set aside,but if allowed to stand, the proceeds should go to the common schools ; that the Receiver, without authority from the Court, had compromised the claim for certain personal property estimated by the parties to be worth $268,982.39, for the sum of $75,000 ; that the Receiver had rented to W. L. Pickard, one of the sureties upon his bond, 30,000 sheep, at the rate of 20 cents per annum per head, when the customary rate was from 40 to 50 cents per head; that the Receiver failed to take possession of a large amount of property owned by the church corporation which he could have obtained possession of in the use of reasonable diligence, and that his failure to do so was from want of attention to his duties, or from wilful negligence, or through a combination with agents of the corporation ; that the Receiver had employed as his attorneys, P. L. Williams, Territorial Commissioner of Schools, and G. S. Peters, U. S. District Attorney for Utah, and had claimed for compensation to himself for his services as Receiver, $25,000, for each of his said attorneys, $10,000, and for his expenses, $7,867.53, in all $52,865.23 ; that these matters had been referred to the Examiner to take testimony upon; that no one had appeared there for the United States ; that the attorneys for the defendants had been instructed not to contest the claims, and that the examination was *ex parte;* that G. S. Peters, whose duty it was to appear for the United States, had no legal right to

ask $10,000 or any other sum, and that the claim of P. L. Williams, if intended to cover future services, might be reasonable; that the amount of $25,000, claimed by the Receiver for his personal services was grossly exorbitant, excessive and unconscionable; that the Receiver should be held accountable for any loss occasioned by bad management, or compromises, and in no event should receive more than $5,000 ; that it was claimed by the Receiver and his solicitors that the common schools had no beneficial interest either in the rents of real estate or in the moneys obtained from real estate by compromise, and since the fund was likely to be diminished by the large claims, the common schools should be allowed to appear, and offer testimony, especially in view of the fact that the Territorial Commissioner of Schools and the United States Attorney were employed against the interests of the common schools, and the petition prayed accordingly.

The Court denied the prayer of the petition "but inasmuch as 'said petition (so ran the order) contains serious charges of fraud and misconduct against the Receiver and his attorneys, it is further ordered that said petition, if verified, be referred to Mr. Robert Harkness, to take and report to this Court such evidence, as may by the petitioners or the Receiver and his counsel *be produced touching the matters in said petition set out,*" and the defendants therein were allowed to answer. The petition was verified and the Receiver and his attorneys, Messrs. P. L. Williams and G. S. Peters, made answer denying the allegations of the petition and issue was joined upon the allegations of the petition and the answer thereto.

Thereupon the examination began before Robert Harkness but was brought to a stop by the Receiver declining to answer questions touching services rendered by him as Receiver, declared by the Referee to be proper, and the Referee decided to report the matter to the Court. Pending the hearing of this report by the Court, the Receiver, through his attorneys, made application to have the order of reference amended, so as to confine the examination to any charges of fraud, corruption, fraudulent claims and

charges for compensation, made in said petition, and not to permit any inquiry into the worth or amount of the Receiver's services.

In regard to the matter of Frank H. Dyer in contempt for refusing to answer questions, the following opinions were read :

Reference—Contempt—Advice of Counsel— Where a witness before a Referee refuses to answer questions, which are ruled by the Referee to be proper, but in doing so acts upon the advice of his counsel, honestly given and accepted in good faith, he will be excused from punishment for contempt, which would otherwise be imposed.

Id.—Id.—Amendment of Order of Reference—When the order of reference has not been drawn in the terms indicated by the Court, a motion to amend the order will be granted, and the matter sent back to the Examiner at a stage in the proceedings where a witness has refused to answer questions ruled by the Examiner and Referee to be proper.

In the matter of the report of Robert Harkness, Referee in regard to the refusal of Frank H. Dyer, a witness, to answer questions and in regard to the application of said Frank H. Dyer to have the Order of Reference amended.

*Messrs. Zane and Zane,* attorneys for School Trustees, showed cause against the amending of the order. They argued that the sole and only reason for the intervention of the school trustees was to save the fund from pillage, by opposing the exorbitant charges made by the Receiver and his attorneys. The petition of the school trustees makes no charges of actual fraud against the Receiver or his counsel. If the order is amended so as to confine the evidence to charges of fraud or corruption or fraudulent charges for compensation, the purpose of the school trustees will be balked. They are not interested in the fund except as school trustees, and in regard to the conduct of the Receiver, they are no more interested than other citizens. The contemplated amendment is an attempt to shift the whole matter from the compensation to be given the Receiver, to a general investigation into the whole conduct of the Receiver. It is a complete shifting of the issues as joined on the petition and answer thereto.

SANDFORD, C. J.:

A petition was presented to this Court in the above-entitled action, signed by T. C. Bailey, Chairman of the Board of Trustees, Seventh school district; Rudolph Alff, Chairman Board of Trustees, Eighth school district, and J. T. Millspaugh, Secretary Board of Trustees of Twelfth district,—for permission to be allowed to become parties therein. That petition was denied on the ground that they were not the proper parties, and had no right to be brought in as intervenors. The petition, however, contained serious charges reflecting upon the Receiver appointed in that action, and upon his attorneys, and it was decided that, while the petition should not be granted, the charges of corruption, fraud, and improper and unprofessional conduct ought to be investigated. Leave was given, therefore, to the petitioners to file their petition in this Court. The persons charged with improper conduct were required forthwith, as officers of the Court, to file their answers thereto; and in the language of the decision then made, "it should be referred to an Examiner to take such testimony as is offered both to sustain and disprove the charges contained in the petition." The question of the amount of compensation which the Receiver should be entitled to receive for his services having been theretofore by an order of this Court referred to an Examiner, it was further decided that question should be reserved until the report of the Examiner to be appointed to take proofs of improper and unprofessional conduct, should be received. Thereupon an order was entered, and the charges of malversation referred to Examiner Harkness. An examination was commenced before that examiner, and the receiver, Dyer, was sworn and interrogated as to his conduct. He refused, under the advice of his counsel, as appears from the record before us, to answer certain questions declared by the examiner to be proper. His refusal so to answer has been reported to this court, and an order is asked for declaring him guilty of contempt, and that he be punished therefor. A motion is also made for an amendment of the provisions of the order heretofore granted, denying the application of the school trustees,

and providing for an examination of the said charges. The amendment requested is that, after providing that the examiner take and report such evidence as may be produced either by the petitioners or the receiver and his counsel, touching the matters in said petition set out, there be inserted after the words "set out" the following words : "To-wit, charges of corruption, fraud and unprofessional conduct," so as to define with more particularity the precise matters referred and to be examined before that referee.

The two applications, as they relate somewhat to the same matter, may be considered together. When the order of reference directing that testimony concerning the charges set forth in the petition was made, it was the intention of the Court that the examiner therein appointed should take proofs touching the alleged misconduct of the officers of the court only, inasmuch as the question of the amount of compensation to be allowed to the receiver had already been referred. This intention was evident from the decision of the Court then rendered. If the order had been drawn so as to embody the purpose of the Court, the amendment to the order now sought would have been unnecessary. If granted now, the amended order will incorporate the intention and decision of the Court as then expressed, and we think the amendment should be allowed. As the order was originally drawn, the petitioners' contention that the question of compensation was also referred had some grounds, if read alone, and not in connection with the decision of the Court. Under the order of the Court as then entered, the questions which the witness refused to answer were proper and pertinent, and the questions should have been answered. On such an examination as this the wiser course generally is not to stand on the accused's legal rights, but to answer fully and in detail all questions that may have the remotest connection with the subject of the investigation. The ruling of the examiner by which he excluded questions relating to the conduct and financial condition of the receiver when acting as a private citizen, or acting in any other official capacity, was correct. The charges made against him were directed to his conduct as an officer of this court, and all questions

that bore on that point, even though remote, and not clearly connected with it, should have been answered. The receiver, as appears from the testimony before us, was advised by his counsel that he need not answer the questions, the refusal of which has been reported by the referee to this court. It has been held in many cases similar to this that such advice, honestly given and accepted, and acted upon in good faith, is to be considered as exculpatory, and in mitigation of the offense. Capet v. Parker, 3 Sandf. 662. The receiver's counsel were wrong in giving such advice. The order, standing alone, and not taken in connection with the decision of the Court, authorized and justified the questions put to the receiver. If, in their opinion, the order was incorrect, it was their duty to have promptly moved the Court for its correction or amendment ; and the examiner, on their stating their wish, would have doubtless suspended temporarily the examination of the witness until the decision of the Court upon their application to amend could have been obtained. Lansing v. Easton, 7 Paige, 364 ; Hilton v. Patterson, 18 Abb. Pr. 245. It has been held that a referee has no power to dismiss a suit because of a refusal of the plaintiff or a witness to testify. He should report the matter to the Court and await its decision. In this case, however, the examination has not been so fully closed that it may not be resumed. We are of the opinion that under the amended order the examination should proceed before the same examiner. We are not willing that the conduct of such officer should, when challenged so seriously as is the case here, be allowed to pass without a full and complete examination, by means of which the charges made may be either proven, or the persons accused exonerated. The hearing, therefore, must be continued as rapidly as possible. Were it not for the excuse presented by the receiver for his conduct before the examiner, a fine would be imposed on him. This refusal to answer, although no one has suffered therefrom, was unjustifiable and contemptuous, and, unexcused, would have merited serious and severe punishment. Under the circumstances presented here, however, the proceedings looking to his punishment should be arrested, and the applica-

tion therefor denied.   He will be allowed an opportunity
in the examination, when resumed, to show that he purges
himself of this particular contempt, by answering the
questions ruled upon by the examiner as proper.   The
question of compensation to be allowed him will, as was
heretofore directed, remain undisposed of until the com-
pletion of the examination now to be resumed.   An order
will be entered providing for the further and speedy inves-
tigation of the charges of improper and unprofessional
conduct, such investigation to be carried on before Exam-
iner Harkness, the time and place of which will be fixed by
the Court in its order.   As to the terms of the order
re-submitting the case to the examiner, I concur in the
opinion read by Judge Henderson.

HENDERSON, J.:

The reference to investigate the charges against the re-
ceiver and his attorneys has failed.   When the report of the
examiner to whom was referred the matter of compensa-
tion to the receiver and attorneys was presented to this
court, or it was announced that it was ready to be filed,
the petition of the school trustees was presented, asking
for the right to intervene as parties to that proceeding,
and we held that the interests of the petitioners were too
remote to be allowed to intervene as parties.   But the
petition contained charges of grossly improper, fraudulent
and dishonest conduct; that by this misconduct the fund
had suffered a loss of over $200,000.   The charge was dis-
tinctly made that this court had been imposed upon and
deceived by the representations of the receiver and his
attorneys; and that the receiver had fraudulently acted in
collusion with the defendants in the case, and with some
of his bondsmen, and that fraudulent and unconscionable
compensation had been sought.   At once, upon the hear-
ing of this petition, without entering upon any investiga-
tion of the matters contained in Judge Sprague's reports
as to the amount of compensation, deeming that question
wholly immaterial to us if these charges contained in this
petition were true, and that the question of the amount of
compensation would never be reached in this court in that

event, this court directed that the petition be received and
filed as charges of official misconduct on the part of the
receiver and his attorneys so far as such fraud and miscon-
duct were alleged therein, and directed an examination of
the charges at once.   The session of the court necessarily
terminated on the day this order was made.   The engage-
ments of the judges imperatively called them to their re-
spective districts at once thereafter; but to facilitate the
investigation it was sought to refer the taking of testimony
upon these charges to an examiner, and, with the consent
of all parties concerned, selection was made of one of the
most eminent and learned members of the bar of this
territory, whose action in the matter has fully justified the
confidence reposed in him.   At the time of making this
order, the court filed in writing a memorandum of the
order that was intended by it.   This was done in view of
the fact that the court would necessarily adjourn before
the order could formally be reduced to writing and entered
upon the journal, and attention was expressly called to it
at the time and counsel were directed to co-operate in pre-
paring the order pursuant to the directions.   This seems
to have been neglected, and the order entered and given
to the commissioner referred all matters contained in the
petition to the examiner.   No answer had been filed to the
charges, and under such circumstances the reference was
somewhat uncertain.   Ample time was given by the order
to each party to produce testimony.   The answer of
respondents was thereafter filed, traversing the entire
petition; and on the day appointed by the order all these
matters were taken to the examiner, and an examination
attempted, and he has reported to us 65 pages of proceed-
ings had before him, and not more than ten pages of this
is testimony.   At once an application was made for an
intervention by active parties.   The parties differed widely
as to the scope of examination.   On the part of the peti-
tioners it was claimed that it was but a continuation of the
examination before Judge Sprague, and that everything
was in issue that was put in issue by the petition and an-
swer; that the respondents, having been examined before
Judge Sprague, could be recalled; and that their character

was in issue the same as though they were plaintiffs in an action of libel or slander; and that they might be cross-examined upon that theory. On the other hand, this was denied, and it was claimed that nothing upon the subject of compensation could be received. The petitioners called respondent Dyer, and proceeded to examine him upon the theory claimed by them. The examiner was without authority conferred by the order of reference. We fully appreciate the embarrassing situation of the learned examiner, and fully approve his conduct of the matter before him, and only regret that he was not vested with authority in the premises; and we propose to refer it back to him, and give him that authority. We can see no good reason why the petitioners should not have proceeded with other testimony, especially in view of the fact that the respondents offered to stipulate that the examiner should have authority to pass upon all questions of the admissibility of the testimony and the scope of the inquiry. It is but fair that a speedy investigation should be had. Counsel, as well as the receiver, are resting under grave charges.

The examination to be had before the Examiner is in no view a continuation of the investigation before Judge Sprague. We have expressly reserved that question until after this investigation. We have not examined the matters of that report, and do not care to until we hear from this investigation. If in the end it comes to be a mere question of computing and estimating the amount of compensation, this Court will proceed to do this upon its responsibility as guardian of the fund in controversy, and will seek such information as is necessary for that purpose. On the other hand, if these charges of fraud are sustained, no inquiry of that kind will become necessary, and the bond of this receiver will stand as an indemnity to 'make good any loss the fund has sustained thereby. The examination is to be had under the order of reference. It is the order of the Court which specifies the matters to be investigated, and confers jurisdiction upon the commissioner, and points out the range of inquiry ; and the parties cannot, by their allegations and denials upon other or immaterial matters, make them

material. We have examined with care the supplemental report made by the examiner, containing a detailed statement of all that transpired before him, and we are satisfied with the rulings he took the responsibility of making, as well as those he intimated he would make if he was himself hearing the case, and had authority in the premises. An order should be entered referring it back to the examiner, and the order should be so modified as to provide that the examiner shall proceed to take testimony produced by either the petitioners or respondents respecting any and all allegations of fraud, corruption, misconduct, fraudulent claims, and charges for compensation and unprofessional conduct on the part of Frank H. Dyer as receiver in this case, and of George S. Peters and Parley L. Williams as his attorneys, contained in said petition; that said Robert Harkness is vested with all the powers and authority of examiner of this Court for such examination; that he be authorized to pass upon and determine all questions as to the admissibility of testimony, the same as though the cause was being tried before him, subject, however, to the right of either party to appeal to this Court by way of exceptions to his rulings thereon; that either of the parties interested be authorized to take subpœnas from this Court for witnesses to appear before said examiner; that said examiner be empowered to employ officers, either Federal or Territorial, to attend him under his direction, and to fix their compensation; to employ stenographers, and to swear witnesses; that such examination on the part of petitioners begin on Thursday next, January 24, 1889, and that they be given four days in which to give such testimony; that the respondents, in reply, commence on Thursday, January 31, 1889, and that they be given four days; and that Thursday and Friday, February 7th and 8th, be given by said examiner to the taking of rebutting testimony, to be divided between the parties as the commissioner shall direct; and that said commissioner make report of such testimony on or before Wednesday, February 13, 1889; and that the hearing upon such report be set for February 16, 1889. The order should further provide that the examiner may

change the above allotment and division of time in any manner he may see fit, but only so that the final report may be made and filed by February 16, 1889. I concur with the Chief Justice in his opinion just delivered as to the matter of contempt.

BOREMAN, J. :

In my view of this matter, the questions asked the receiver as a witness, and which he refused to answer, were, as the examiner ruled, proper, and should have been answered, and this he should be required to do, whether the amendment of the order as prayed be allowed or disallowed. It is no doubt true that nothing was intended to be referred to the examiner except the charges made in the petition of Messrs. Bailey, Alff, and Millspaugh. But one of the charges made in that petition was that the receiver had made an unconscionable claim for compensation ; and, that being so, such claim was a proper, although not the main or most important, subject of inquiry by the examiner. It would have been misconduct in the receiver to have made such a claim. If I have read aright the report of the examiner, his view was that such matters in the petition as referred to other subjects than the charges of misconduct, fraud, etc., were not before him, but that all of the charges made by the petitioners against the receiver and his attorneys were before him for investigation. This view was correct, and I approve the rulings made by the examiner on this subject. The amendment sought to be made to the order of the Court is, in my view, not very important, and it would not materially change the subjects of investigation, and with the change made the receiver would still be required to answer the questions. The answer of the receiver and his attorneys took issue on the unconscionableness of the receiver's alleged claim for compensation ; and as to the wording of the order the Court had advised counsel to confer and to examine it before it should be entered. This was not done, and it seems to me that it is now too late, even although the order did not technically conform to the wording of the opinion of the Court delivered at the

time.   The order should now be that the receiver make answer to the questions, and, if he still decline to do so, that he should be punished as for contempt.

I heartily concur in referring the subject of the charges back again to the examiner ; and the renewed order of the Court will give ample authority to the examiner to fully investigate all the charges made, and to confine the investigation to the charges made in the petition.   The question of the amount of compensation that should be allowed the receiver is only incidental in this investigation.   That question will come before us for fuller examination when we come to consider the report of the former examiner, Judge E. T. Sprague.   Its purpose in this investigation is to show whether the receiver's claim be unconscionable or not.   If it be so, the Court should know it ; not, perhaps, to fix what his compensation should be, but to enable the Court to know whether the receiver has been acting in good faith with the Court. If he has not, he should be removed.   Evidence as to his compensation should be allowed so far as it may, even in the remotest degree, show misconduct on the part of the receiver, as charged, or that any claim he may have made is unconscionable or fraudulent.   These charges of fraud, corruption, and misconduct in the office of receiver and of his attorneys are so grave and serious that the Court cannot and will not pass them by, and the parties making them will be allowed ample time and opportunity to substantiate them, if it can be done ; and the respondents will also be allowed ample time and opportunity to defend themselves against the charges, and to introduce evidence bearing upon their exoneration.   It has been claimed and urged that the petitioners are prepared to substantiate the charges they have made ; and the parties charged have been equally positive that no such charges can be substantiated, and that they are prepared to show themselves entirely free from them.   It is to be hoped that all parties will now improve the opportunity again offered to bring out all the facts in the matter.   The investigation, to be satisfactory, must be searching and complete, no matter what the result may be.   Counsel

should keep this fact in view throughout the whole examination. The Court will insist that these charges be sifted to the very bottom, and there should be no delay or obstruction to such searching examination. The parties are officers of this Court, and the Court owes it to itself that the investigation shall be thorough, and will be satisfied with nothing less. Counsel on both sides should earnestly endeavor to aid the examiner and the Court with that view. If any witness refuse to answer any question of importance, the question could be waived for the time being, and the examination allowed to proceed as to other branches or charges set forth by petitioners. The doors should be open to the fullest extent, and even, if necessary, go to the very verge as to competency. Of course, matters in no way connected with the charges made ought not to be brought in, but all that is competent should be brought out. The Court is confined to evidence upon questions in issue, and cannot go outside to investigate extraneous matters, and such as are not connected with the charges made. But the charges are broad and specific, and, if they be sustained by evidence, no additional or outside matters would be necessary ; for, if the charges as made be true, the Court would not make any allowance of compensation to the receiver or to his counsel, and probably other action would be taken by the Court. The new order embodied in the opinion of Associate Justice Henderson, and which is to be entered in the case, as to a re-submission of the matter to the examiner, conforms substantially to my views, and will give the fullest opportunity to introduce the evidence as to the alleged unconscionable or fraudulent character of the claim of the receiver for compensation.

Afterwards the order was amended so as to confine the hearing before the examiner to any and all allegations of fraud, corruption, misconduct, or fraudulent claims and charges for compensation and unprofessional conduct on the part of the receiver and his attorneys.

Thereupon the School Trustees filed in court the writing set out in the following opinion and therein adjudged to be contemptuous :

CONTEMPT—DISRESPECTFUL LANGUAGE TO THE COURT—Language used in a certain paper submitted to the Court quoted and held to be a contempt of court.

JUDD, J. :

On the 1st day of December, 1888, T. C. Bailey, Rudolph Alff and J. F. Millspaugh, describing themselves to be Trustees of the Seventh and Eighth School Districts, and Secretary of the Board of Trustees of the Twelfth School District, brought before this court a petition in which they set out by description divers and sundry pieces of real estate, alleging that the same was the property of said late corporation.   They likewise alleged that on March 23, 1888, April 4, 1888, and May 14. 1888, Receiver Dyer instituted actions in the Third Judicial District Court of this Territory against various defendants, and in the complaints in said suits, among other things, alleged that said last above-described tracts of land were obtained and held by said late corporation in violation of section 3 of the act of July 1, 1862, and not for the purposes of the worship of God, or parsonages, or burial grounds, and that the claims of the various defendants in said suits were invalid, and prayed that the deeds of said various defendants be held to be colorable, and that the cloud upon the title created by such deeds be removed, and that the possession of the said lands be adjudged to the said receiver for the uses and purposes mentioned in the said section 3 of the act of March 3, 1887.

The petition then proceeds to state that afterwards, on or about the 9th day of July, 1888, the said receiver and the defendants to the suits above named compromised said suit, and in lieu of said tracts of land described in said

complaint, except a portion of lot 8 in block 76, that said receiver took the sum of $84,666.15, or a note therefor, to stand in the place thereof, and to be treated and applied as the land should have been treated and applied ; that the solicitors of said corporation were the attorneys of said defendants, except one, in said compromises, and thereby admitted that the land had been obtained by the late corporation, in violation of said acts of Congress, and that the plaintiff was entitled to recover if said acts were valid, and in effect admitted that the money received should be substituted for said lands, and should be applied for the benefit of said common schools ; that the order of this court, authorizing the said receiver to compromise said suits, was made by the Court, "as your petitioners are informed and believe, solely upon the recommendations and representations of the receiver and his solicitors, who stated to the Court that the estimates in the petition for authority to compromise were the reasonable values of said tracts under the circumstances ; and that said compromises were fair and reasonable. Your petitioners charge, however, that said tracts of land were worth $225,000, and that $84,666.15 was a grossly inadequate valuation of property ; that no evidence was heard by the Court in regard to said compromise, and your petitioners believe that the Court was misled by the said representations and recommendations of the receiver and his solicitors ; that the said order of the Court required the receiver to report said compromises to the Court for its approval, and that such report has not been made."

The petition then proceeds to allege that the compromises should be set aside ; but, if they are allowed to stand, then the money or notes, or other evidences of indebtedness, or the proceeds thereof, taken for or in lieu of said land, must be applied as the land and the proceeds thereof were required to be.

The petition further alleges that the said receiver now has in his possession the sum of $75,000, received in compromise for cattle and other property ; that said property, as petitioners are informed and believe, was worth at the time $250,000 ; that it was estimated by the parties to this

suit in a stipulation of facts made October 19, 1889, to be worth the sum of $268,982.39 ; and that this transaction between the receiver and defendant corporation was made without authority from this Court. And, further, that since the appointment of said receiver he has obtained possession of 30,000 sheep, the property of the defendant corporation ; and after receiving the same he rented them without any authority from the Court, and without public notice, to one W. L. Pickard, a surety upon said receiver's bond, at the rate of 20 cents per head per annum, when the customary price was from 40 to 50 cents per head, and that in such renting of said sheep the fund sustained a loss of about $5,000.

The petition further alleges, as petitioners are informed and believe, that there is property to a large amount, of which said receiver has not taken possession, that was owned by said defendant corporation and was in the possession of its agents, or of others for said corporation, after said receiver qualified, and that he could have taken or obtained possession of said property by the use of reasonable diligence as receiver, and that his failure to do so was from want of attention to his duties as receiver, or from willful negligence, or through combination with agents of the late corporation.

The petition further alleges that the receiver, after he had entered upon his duties as such, retained one P. L. Williams, who was and is Territorial Commissioner of Schools, and one George S. Peters, who was and is the attorney for the United States in this Territory, as his attorneys and solicitors ; that the said receiver was, at the time of his appointment, and now is, United States Marshal for said Territory ; that as receiver he presented a claim for allowance to him for clerk hire, compensation to solicitors, agents, and employes, for office rent, stationery, and other expenses, amounting to the sum of $7,865.53 ; that, not having yet been made parties to this proceeding, or granted leave to appear therein, " your petitioners have not examined the said report of expenses of the receiver sufficiently to point out objections thereto ; that such an examination would involve a scrutiny of vouchers, and

probably an examination of witnesses ; but that, if permitted by the Court to do so, your petitioners, as they are informed and believe, can point out well-founded objections to said account."

The petition further states that the receiver has presented a claim for allowance to himself for his individual services as receiver, of $25,000, and in addition each of his solicitors presented a claim for $10,000, said claims aggregating $52,865.23 ; that said claims for allowance were referred to the examiner in this case to take testimony as to the amount to be allowed ; that the United States Attorney for Utah, and the Territorial Commissioner of Schools, both appeared for the receiver in the taking of such testimony, and no one appeared for the United States or for the said common schools ; that on such examination the defendant corporation at first appeared by its solicitors, Messrs. Sheeks & Rawlins, and by them the first witnesses produced by the receiver were cross-examined, but afterwards, as petitioners are informed and believe, they were instructed by the defendants not to cross-examine and not to contest the claims of the receiver or of his solicitors, and thereupon they ceased to make any further contest, and the examination became and was wholly an *ex-parte* examination by the receiver and his solicitors before said referee.

The petition then proceeds to allege that under the law George S. Peters, as United States District Attorney, was bound to appear, by virtue of his office, for the United States in all suits to which the United States was a party ; and that he was not entitled to have or receive any sum for any services he may have performed as solicitor for the receiver in this case, and that the claim of the said Williams as solicitor for said receiver was much too large.

The petition then proceeds in so many words to charge as follows : "Your petitioners further represent that the amount, $25,000, claimed by the receiver for his individual services, is grossly excessive, exorbitant and unconscionable ; that the allowances to the receiver for his services must be only for those rendered by himself, and he cannot

be allowed for services for which his agents and employees may be allowed and paid."

The petition further states that the difference between the amount for which the 30,000 sheep above mentioned could have been rented, and the amount for which they were rented, is about $5000, and that this amount should be deducted from the receiver's compensation, if in view of his breaches of duty, he is entitled to any compensation; and if it be that he so rented said sheep in return for any benefit to himself, or the hope thereof, then he ought not to receive any compensation, and said contract of renting should be disapproved, and the receiver held for all loss to the fund in consequence of such wrongful renting.

The petition further states that the "petitioners are informed and believe that the sum of $75,000 above mentioned, received from the defendant in compromise for certain property above mentioned, was a grossly inadequate consideration, and the receiver should be held to account to the fund for the difference between $75,000 and a fair consideration for such property, and such difference your petitioners believe is not less than $175,000 ; or that said transaction should be disapproved by the Court, and the receiver held to a strict accountability for all loss in consequence of his wrongful action ; and, further, that the receiver should be held accountable for the loss to the fund, and to the common schools, caused by the compromise upon the real estate above mentioned ; and this loss, your petitioners charge, on information and belief, is not less than $135,000, and that, further, if said receiver be allowed any compensation at this time, it should not in any view exceed $5000."

The petition then proceeds to charge that inasmuch as no one has appeared on behalf of the common schools, the fund is likely to be greatly diminished by said claims made against it, and that the appearance of some one for the common schools is rendered absolutely necessary to the ends of justice ; and the fact that the Commissioner of Common Schools of this Territory is employed by said receiver against the interest of said schools, and that the United States Attorney for this Territory is also employed

against the interest of said schools, and that the receiver himself is an officer of the United States, and that they are claiming that by a compromise the said schools have already been deprived of a large portion of the proceeds of said lands, and that the proceeds have become the property of the United States, furnish additional reasons for permitting the trustees of district schools to appear in this proceeding. Wherefore the petitioners pray as follows: "That they may be made parties to such proceedings, or that they may be allowed to appear by their solicitors, or otherwise, in order to defend and protect the interests of the common schools they represent, and preserve so much of the fund as may belong to said schools, and that such other trustees of district schools as may wish to come in may also be made parties, or allowed to appear, and that your petitioners may be allowed to produce evidence to prove and substantiate the facts stated in this petition, and that your petitioners may have such other and further relief as to equity belongs, and as to this Court appears to be equitable." Signed and sworn to by T. C. Bailey, Chairman Board of Trustees, 7th District, Rudolph Alff, Chairman Board of Trustees, 8th District, J. F. Millspaugh, Secretary Board of Trustees, 12th District.

Upon the application of the solicitors of said petitioners to be allowed to file said petition in said above-entitled cause, to become parties thereto, this court filed an opinion, written by Henderson, J., in substance as follows : "This is an application of certain school trustees to be allowed to intervene as parties to the case. We are of the opinion that petitioners do not show by their petition any right to intervene as parties. There is nothing to show that the Government is not disposed to look after the interests of the fund, and the interests of petitioners as school trustees are too remote to be recognized by an order allowing them to intervene. But the petition which has been read contains charges of a grave and serious nature against the receiver and his attorneys, Messrs. George S. Peters and Parley L. Williams. The charge has been directly made that the receiver has acted corruptly, and in criminal collusion with the defendants, and that this Court

has been imposed upon by the representations of the receiver and his said attorneys, and a fraud thereby accomplished. If this be true, a crime has been committed, and this Court cannot and will not pass it by without attention. As the action of these officers charged with a delicate and difficult duty has been so seriously challenged, they should be met by responsible accusers, and have the opportunity to confront them. Either the receiver and his attorneys have been guilty of a crime, or some person or persons are interested in falsely accusing them. The petition, upon being verified and indorsed by some persons responsible for the costs which may be incurred, should be received and filed as charges against the receiver and his attorneys, and they should each be required to file their respective answers thereto, so far as the charges of corruption, fraud and unprofessional conduct are charged against them, respectively, and upon the filing of their answers it should stand referred to an examiner, to take such testimony as is offered both to sustain and disprove the charges contained in the petition, and report the same to this Court on or before the next regular term of this Court. If the charges of corruption and improper conduct are sustained, and the fund in controversy in this case thereby preserved and protected, provision can hereafter be made for the payment of expenses incurred ; but in the meantime we shall postpone the question of compensation to the receiver and attorneys until the bringing in of the report. We have only had a few hours to consider this matter, and therefore we have not had time to state more in detail our reasons for this action. An order should be entered conformable to this opinion."

Answers were filed by the said Dyer and his solicitors in due time, denying all said charges in full. When this opinion was rendered by the Court, it was distinctly stated to the persons interested, that the order should be drawn in conformity with the opinion, to be accepted and agreed upon by the parties and attorneys on both sides, and when such was done it should be handed to the clerk of this Court, to be entered upon its minutes. Inasmuch as the question of compensation to the receiver had already been

referred to the clerk of this Court as special commissioner, it was not thought proper or necessary to refer that question again to another commissioner, but it was intended, as the opinion above set out clearly indicates, to refer the charges of wrong action by the receiver and his attorneys to a special commissioner, instead of which, however, an order, which was not presented to the Court, seems to have been drawn and entered, which in so many words refers to Mr. Robert Harkness the case, to take and report to this Court such evidence as may by the petitioners or the receiver and his counsel be produced, touching the matters in said petition set out. This order, as will be clearly seen, was not in accordance with the opinion of the Court, for it was not intended to refer the question of compensation to the receiver, it having already, as above stated, been referred to another person, as special commissioner, to take proof and report thereon. How be it, when the parties met before Commissioner Harkness they differed materially as to the matters that were referred, one side insisting upon taking proof upon all the matters mentioned in the petition, and the other side insisting upon confining the investigation within the scope indicated by the opinion of the Court. Such proceedings were had as resulted in the application to this Court to amend or reform its order of reference, and upon that application the Court made the following order : "It is hereby ordered that the motion to amend the journal entry be, and the same is hereby, allowed; and that the said Robert Harkness, the examiner heretofore appointed, proceed and take such testimony as may be produced by either party to this proceeding respecting any and all allegations of fraud, corruption, misconduct, or fraudulent and unconscionable claims and charges for compensation, and unprofessional conduct on the part of Frank H. Dyer, as receiver in the case, and of George S. Peters and Parley L. Williams, as his attorneys, contained in said petition of said school trustees heretofore filed in this Court."

It will be observed that the petition of the persons heretofore mentioned expressly charged that the receiver and his attorneys, Peters & Williams, misled and deceived the

3

Court into the adoption of a compromise of the suit against the defendants for the recovery of the real estate mentioned, and that by this fraud and deception there was a loss to the fund of over $100,000. It was further charged that the receiver rented 30,000 sheep for 20 cents per head per annum, when he could have gotten 40 cents per head; and it was further charged that he compromised a claim for cattle for $75,000 that was worth $268,998.39, and that the transaction was made without the authority of the Court; and it is further charged that property to a large amount, which the receiver could have taken possession of, belonging to the late corporation, was by him neglected; and that his failure to do so was for the want of attention to his duties as receiver, or from willful negligence, or "through combination with agents of the late corporation." And it was charged that Peters abandoned his duty as district attorney to the government, and took employment from the receiver, and that he was making a claim against the interests of his client, to-wit, the government, and thereby impliedly charged with malfeasance and corruption in office. It was further charged that P. L. Williams, a commissioner of schools accepted employment against the interests of the school fund, and that he was guilty of official misconduct, and that finally the claim upon the part of the receiver for $25,000 as compensation, to use the exact language of the petition, "is grossly exorbitant, excessive, and unconscionable." It is difficult to imagine how stronger charges than these could have been made, and even if one of them should be true, then the receiver and his solicitors are not only not entitled to compensation, but the receiver should be dismissed from his office as such, and his attorneys disbarred from the right to practice in the Courts of this Territory. Taking this view of the matter, the Court readily, and without hesitation, sought by all means in its power to give to these petitioners an opportunity to prove the charges, and hence in its amended order made the reference as broad as it could well be made, and even went so far as to include in the reference all allegations of fraud, corruption, and misconduct or fraudulent and unconscionable claims and charges for

compensation, and unprofessional conduct on the part of the receiver. On the day after the last order was made said petitioners, together with one other person, by the name of L. U. Colbath, who had not heretofore appeared before the Court, came into Court and presented through their counsel a paper writing, containing, in substance, the following : "Unto the Court your petitioners, the school trustees, respectfully state: The order of the Court, as now modified by the Court, has totally changed the nature of this proceeding. A petition in chancery has been transformed into a criminal complaint. We came here to contest the compensation of the receiver and his solicitors, and our petition was for that purpose. Under the former order of the Court we could have done so; under this order we cannot. The Court has now ruled that we cannot do the only thing, that, as school trustees,we are interested in doing, or had the right to do. We are completely excluded by this amended order from performing the only duty in connection with the matter that our office places upon us. But by this amended order the Court would impose upon us the duty of carrying on an investigation into the conduct of the officers of the Court for the sole benefit of the Court, while confining by their order the inquiry within narrow limits. The Court has decided that our particular inquiries of the receiver were proper, but at the same time has ruled that all other questions of the same nature are improper. The Court has so changed the order that it is doubtful whether we could introduce testimony upon most of the allegations of the petition, because, legally, they do not amount to charges of fraud, corruption, or professional misconduct. We are cut off from all inquiry into anything except those particular statements in the petition which directly and in sufficient legal phrase charge fraud, corruption, or professional misconduct. We can offer proof under this order only of a charge for compensation that is both fraudulent and unconscionable. We have no allegation of such a charge in our petition, and therefore we can offer no proof whatever on the subject of compensation. Had we understood when this reference was made that the investigation would be limited as it now is,we would then have

declined to proceed. If it be the duty of the Court to care-
fully scrutinize the conduct of its own receiver, and if it
would place this duty upon us, then it should not limit the
investigation, as it now does, to particular acts, and those
alone, but it, in justice to us, should extend the investi-
gation to his entire conduct as receiver. In assuming the
duty of the Court, as we would, were we to proceed under
this order, we would be so confined and hampered that we
could not make our investigation complete. While pro-
ceeding under the original order, we were authorized to
offer evidence as to everything that the receiver had done
or had failed to do, in order that we might enable the
Court to fix the compensation of his services. But this
matter being excluded by the amended order, only a small
part of the receiver's doings can be investigated. Under
these circumstances, we believe it would be better that the
Court, if it so desires, should investigate the conduct of
its officers for itself, in a proceeding where the examina-
tion would not be cramped and narrowed as it is under
this order. In that way the examination would be more
thorough, and more satisfactory to the Court. As long as
we had some chance of benefiting the common schools of
this territory, we thought it our duty to proceed, but we
conceive it to be no part of our duties as school trustees to
prosecute charges of fraud and corruption against officers
of this Court, nor do we conceive it a part of our duties
either as school trustees or as private citizens, to incur
the large expense of summoning witnesses from different
counties in the territory, and even from Idaho and Arizona,
merely to assist the Court in scrutinizing particular acts of
the receiver; and in view of the facts above stated, and the
complete change in the character of the investigation
made at this late day, we must decline to assume the
functions of a grand jury, or to attempt to perform the
duties of the Court in investigating the conduct of its own
officers. All of which we respectfully submit."

It is difficult to conceive of a more deliberate and bare-
faced attempt to trifle with the Court than has been
attempted by the conduct of these petitioners. They
assume the responsibility of making charges against

officers and attorneys of this Court which were of such a character as no Court could overlook. Every opportunity has been given to them to have a full and ample hearing to substantiate the charges, and after that they come into this Court with a paper whose statements are untrue, and of a most scurrilous nature, and couched in the most disrespectful language, and by innuendo. and almost by direct charge, attempt to put the Court in the position of undertaking by itself to shield its officer and its attorneys against an investigation of charges under which no man can stand up and face an honest community. The paper is full of false assumption from end to end, as can easily be seen by reference to facts heretofore recited. They undertake, in the paper last quoted, to say : "We can offer proof under this order only to the charge for compensation that is both fraudulent and unconscionable. We have no allegations of such a charge in our petition ; therefore we can offer no proof whatever on the subject of compensation,"—when the fact is their original petition, in so many words, charged "that the amount of compensation, $25,000, claimed by said receiver for his individual services, is grossly exorbitant, excessive and unconscionable." And it will be seen that in the order made by the Court, and complained of by the petitioners, the exact words, "fraudulent and unconscionable," are used with reference to the charges for compensation by the receiver. The paper has no place whatever in the proceedings. Nothing is asked by it. It is wholly voluntary, and gratuitous, and was evidently only for the purpose of putting in studied phrase and in writing contemptuous and insolent language. It is impossible for this Court to maintain its integrity and pass by without notice and without action such a contemptuous proceeding as these petitioners have been guilty of, and we are of the opinion that the clerk of this Court should issue a written notice to each of the persons, Rudolph Alff, J. F. Millspaugh, L. U. Colbath, and T. C. Bailey, requiring them to appear before this Court on to-morrow morning, January 30th, at 10 o'clock A. M., to show cause why they should not be punished for their contempt ; and, in case they fail to

appear, the clerk shall issue writ of attachment for their arrest, and to bring them forthwith before the Court.

SANDFORD, C. J., and HENDERSON, J., concurred.

BOREMAN, J., dissented.

The School Trustees having been cited to appear, made answer to show cause why they should not be punished as for contempt. The answer alleged that it being proposed to take an aggregate of $52,000 from the fund, they were authorized by their respective school boards to contest these allowances, that on that ground they had filed their petition, that their intervention being refused, they yet were permitted to offer evidence under the order of the Court ; that they were advised by their solicitors that under the order they would be in almost the same position as if allowed to intervene ; that answer was made by the receiver and his attorneys, denying the allegations of their petition, that the examination was begun before the referee, but was closed by the receiver insisting on construing the order to suit his own views, that being cited as for contempt, he made application to amend and change the order, which amendment was allowed ; that the solicitors for the School Trustees in order that there might be no misunderstanding asked for the following insertion : That testimony should be taken " as to whether $25,000 is an excessive, exorbitant, and unconscionable charge for what said receiver has done, and in proof of such issue, any evidence may be offered of what the receiver has done or of what he has not done that he should have done ;" that this insertion the Court declined to make ; that thereupon the School Trustees were advised by their solicitors that the amended order of reference confined the issue to charges of fraud, corruption, misconduct, fraudulent and unconscionable charges and claims for compensation or professional misconduct, and that there were no allegations in their petition that were charges of fraud, corruption or misconduct except one, and none that were charges of fraudulent and unconscionable claims or professionable misconduct, and that they would probably be permitted to offer no proof on

any of the allegations of the petition except the single one
of the receiver having failed to take possession of certain
property that he could have taken possession of, and in view
of the situation they deemed it necessary, in courtesy and
deference to the Court, and in justice to themselves, to
state to the Court their reasons for declining to proceed ;
that their statements made in the paper which they sub-
mitted to the Court, so far as they are statements of legal
conclusions, were made upon the advice given to them by
their solicitors ; that they were advised by their solicitors
that they could offer proof under this order only of a charge
for compensation that was both fraudulent and unconscion-
able. They were further advised that the allegation that
the claim of the receiver was grossly exorbitant, excessive
and unconscionable, was not a charge of a fraudulent and
unconscionable claim, because there was a distinction be-
tween a fraudulent and unconscionable claim and an ex-
cessive, exorbitant and unconscionable claim, and that they,
therefore, could offer no proof whatever on the subject of
compensation.

Upon the filing of this answer, the following opinion
was delivered :

JUDD, J. :

Upon January 30th the parties heretofore adjudged by
this Court to be in contempt came into Court by their at-
torneys, and presented an answer to the charge against
them, in which they use the following language : "Your
respondents further desire to represent to the Court that
the information, which they have collected at great trouble
and cost, is of a nature that should come under the notice
of the Court, and that information, and the names of the
witnesses, they will be glad to submit to the Court." When
the petition was first presented by these persons to the
Court, making such serious charges against Receiver Dyer
and Attorneys Peters and Williams, the Court then had,
and at all times since has, determined that no stone should
be left unturned in making a most thorough and searching
investigation of said charges. The offer by these petition-
ers, made now in their last response, to furnish to the Court

evidence and information whereby said charges can be proved, is accepted. If these charges which have been made shall be sustained, so far as the question of compensation to Dyer and his solicitors is concerned, it will be one of easy solution; for, if they have been guilty of the conduct charged, then this Court will not allow them any compensation for any sum, so that these petitioners can easily reach the question of compensation, concerning which they seem so anxious, by furnishing this court with the proof, which they say is in their possession and that they have collected at great trouble and cost. If they have acted in this matter in good faith, and if they are now acting in good faith, and if they have acted upon information which is of the value that they seem to attach to it, and the charges are sustained, then the question of compensation will be settled without a hearing upon the report of Commissioner Sprague, to whom the question of compensation was referred. It is now required of them that they furnish to the attorneys to be appointed by this Court any and all information which they may have, of every kind and character, concerning the charges which they have made in their petition against Dyer and his solicitors, and that they likewise and in like manner furnish the names of their witnesses, together with a written statement of what particular charge they will testify about, so that the attorneys to be appointed by this Court may be able to proceed intelligently with the investigation.

So far as the disposition of the case which is now pending before this Court against these petitioners for contempt is concerned, the decision will be postponed until an investigation is made of the charges heretofore mentioned. We are of the opinion that we can best dispose of that in the light of what may or may not occur in respect to that investigation.

SANDFORD, C. J., and HENDERSON, J., and BOREMAN, J., concurred.

Thereupon all the information and facts and names of witnesses were turned over to the Court, and the Court appointed Mr. John A. Marshall and Mr. E. B. Critchlow,

who was objected to as interested in the receiver's account, to conduct the case on behalf of the Court, and the examination was resumed.

The testimony was exceedingly voluminous and showed in addition to what are stated as facts in the opinion that the compromise upon the real estate was recommended to the Court by the attorneys for the receiver, one of whom stated that the compromise was for the reasonable price of the land; that the whole of the suits was compromised for the price paid for a part of the land by the alleged purchaser; that one member of the Court was misled as to the compromise. As to the sheep, it appeared that they were rented to W. L. Pickard without any public advertisement, who was a surety upon the receiver's bond. The price was 20 cents per head. The evidence varied widely as to the cash rental of sheep, and was put all the way from 20 to 50 cents. The testimony as to the compromise of personal property for the sum of $75,000, showed that it was something more than a compromise for personal property, but was in fact a " final settlement " according to the receiver, and so understood by the Church attorneys; that final judgment was immediately entered, which made no reservation and would offer an insuperable obstacle to the recovery of any other property or even to the ·further prosecution of suits already begun; that it was made five months before the entry of final decree, but never reported to the Court, and since it had been made, no further attempt was made to recover property. The evidence tended to show that in every county and town there was real estate belonging to the church, to recover which no attempt had ever been made; that the suits at Ogden could be in no sense regarded as a test case, but were peculiar as to the facts. The evidence further showed that the personal property had been converted by the different stake corporations, which were responsible, and not by private persons at all; that the property had been delivered to them and they could have been made parties to the main action and judgment there taken against them. As to the compensation, the evidence showed that the examination was begun before Judge Sprague. The government was represented

by George S. Peters, *sub modo.* The receiver was represented by P. L. Williams; the defendant, church corporation, by LeGrand Young and Sheeks and Rawlins; that the receiver testified at length to his services, which he represented to be very great; that witnesses were introduced by the receiver who testified on the basis of the receiver's testimony; that Mr. Peters appeared to be acting for the receiver; that the attorneys for the defendant cross-examined the witnesses the first day; that thereupon the receiver went to the church officers and obtained from them a direction to their attorneys not to contest his claim for $25,000; that on the second day the attorneys for the defendant stated this fact and demanded from Mr. Peters whether he represented the government or the receiver; this Mr. Peters refused to say, but admitted that he was acting for the receiver and for the government, to a "certain extent." The examiner then stated that he recognized Mr. Peters as acting for the government; that thereupon the attorneys for the defendant protested against the examination proceeding without the government being represented and some attempt made to resist the large claims made; that the examiner then proceeded without any opposition from any quarter to the receiver's testimony and his witnesses' and attorneys'.

Hon. R. N. Baskin appeared for the public before the examiner Harkness, and was permitted to cross-examine certain witnesses, but he was then objected to by the receiver's counsel and excluded by the examiner, who stated that he did so upon the advice of members of the Court.

The referee, Judge Harkness, filed his findings of facts, finding no fraud or wilful misconduct or intentional wrong-doing on the part of the receiver or his attorneys, but he declined to pass upon the question whether the receiver or his attorneys had made exorbitant claims against the fund since such a question was not referred to him. The attorneys who acted for the Court, Messrs. Critchlow and Marshall, filed exceptions to the report, and the Court thereupon delivered the following opinion :

RECEIVER—MISCONDUCT—COMPROMISE—Where it appeared that the receiver, acting upon the advice of competent attorneys, had compromised the claim of the receiver against certain real estate for far less than the value of the property, *held* that the receiver will be held blameless whether his attorneys acted rightly or not.

ID.—MISCONDUCT OF ATTORNEYS—COMPROMISE—The receiver began suit to recover certain real estate alleged to have been conveyed on trust for the defendant corporation. Afterwards the receiver presented a petition to the Court to be allowed to compromise the suit for all the land, for the amount claimed to have been paid for a part of the land, such amount being far less than the value of the land. His attorneys recommended the compromise to the Court, one member of which was misled by the statements made; *held* that the attorneys were not guilty of any misconduct.

ID.—MISCONDUCT OF RECEIVER—RENTAL OF PROPERTY—The receiver came into possession of 30,000 sheep, of inferior quality. He, without public advertisement, rented these sheep to a surety upon his bond, a responsible person, for the general cash rental of 20 cents per head, the lessor not being bound to return the same or an equal number of sheep of the same quality, the testimony also showing that the rate of rental was all the way from 20 to 50 cents per head, but that the sheep industry was at the time depressed and cash rentals rare; *held* that there was no misconduct on the receiver's part.

ID.—COMPROMISE FOR PROPERTY—The receiver found that large quantities of personal property had been conveyed by the church corporation by an assignment, adjudged to be fraudulent, to the various stake corporations and much of it by them converted. The receiver made some attempt to recover it *in specie,* but found it impossible to identify the greater part of the property. The property was set out in an inventory in the case, and there described as being worth $268,000. The receiver compromised all claims against this property for $75,000 in cash, which was not reported to the Court. The compromise was known to the United States attorney,who was also the attorney for the receiver. *Held* that his action was entirely proper.

ID.—NEGLECT OF DUTY—NOT TAKING PROPERTY—The receiver cannot be charged with having neglected to take possession of property alleged to belong to the defendant corporation, when it appears that he has brought three suits that were pending to test the question of his right to recover some of the property from third persons, holding the legal title, and he was waiting the issue of these suits as test questions, although it appears that by the agreement of the receiver and his attorneys, one of whom represents the government, the plaintiff, that a final decree had

been entered adjudging certain property theretofore taken to be the property of the church and making no reservation as to any other property.

Id.—Misconduct—Excessive Compensation—An excessive claim made by a receiver for compensation, is not a fraudulent claim; *quaere*, is it " unconscionable?"

Id.—Misconduct—U. S. District Attorney—Although the law makes it the duty of the U. S. district attorney to appear for the United States, there is no incompatibility between such officer appearing and acting in the litigation for the plaintiff, the government, and at the same time for the receiver, nor between the U. S. attorney appearing for the government " to a certain extent " and at the same time appearing and acting for the receiver at an examination, to take testimony as to the compensation for the receiver and himself as attorney for the receiver, when his employment by the receiver is authorized by the general law officers of the government.

Henderson, J.:

On the 27th day of November last, certain school trustees filed a petition in this Court, containing charges of misconduct on the part of the receiver and his attorneys, and praying that they might be made parties to the proceedings then pending in this Court to fix the compensation of said receiver and his attorneys, and that they might " be allowed to produce evidence to prove and substantiate the facts stated in said petition." Upon a hearing had upon said petition, this Court determined that the interests of said trustees were too remote to allow them to intervene as parties, but that the said petition should stand as charges against the said receiver and his attorneys of official misconduct, and ordered that the same be referred to Robert Harkness as special examiner, to take the proofs offered in support of said charges. It is unnecessary to recount at this time the various proceedings had in this Court, and the efforts from time to time made to have said charges investigated, which finally resulted in the withdrawal of said trustees, and the ordering by this Court that said charges be investigated. The final order of reference was made January 21st last, and provided that said examiner should " proceed to take testimony respecting any and all allegations of fraud, misconduct, fraudulent

and unconscionable claims and charges for compensation, and unprofessional conduct on the part of Frank H. Dyer, as receiver in this case, and of George S. Peters and Parley L. Williams as his attorneys, contained in said petition; that said Robert Harkness be clothed with all the powers and authority as examiner of this Court for such examination; that he be authorized to pass upon and determine all questions of the admissability of testimony, the same as if it were being tried before him, subject, however, to the right of either party to appeal to this Court by way of exceptions to his rulings thereon." The order further provided that said examiner should make report to this Court with all convenient speed of all testimony taken before him, together with his opinion and conclusions thereon. The said petitioners having withdrawn from such investigation and tendered to this Court the testimony upon which such charges were made, attorneys were appointed by this Court to prosecute the said inquiry for and in behalf of the Court, and the receiver was directed to put in the possession of said examiner sufficient means to procure the attendance of all necessary witnesses. The examination upon this order of reference has been had, and the examiner has filed his report, together with his findings and conclusions thereon. Certain exceptions having been taken by the attorneys appointed by this Court to the said report, and the conclusions of the examiner thereon, and the said exceptions, and the motion made by the attorneys for the said respondents, the receiver and his attorneys, to confirm the said report, have been heard and submitted to us for our determination. The report is accompanied by the testimony at length taken by the examiner, consisting of 1,151 pages, accompanied by various documentary evidence.

The examiner in his report says: "Under these orders there has been a very full hearing, and I return herewith and as part of this report all the testimony and proceedings." He has classified and given the substance of the testimony upon each particular branch of the case according to his subdivisions, stating his conclusions upon each, and at the end, as a general conclusion, he finds as follows:

"I find that there was no fraud, corruption, misconduct or fraudulent and unconscionable claims or charges for compensation or unprofessional conduct on the part of the receiver or his attorneys in respect to any of the transactions set forth or contained in the said petition." It will be seen that this order of reference settled no specific issues, but submitted the whole matter to the examiner, to investigate any and all charges of fraud, corruption, misconduct and fraudulent and unconscionable claims or professional misconduct on the part of the receiver and his attorneys."

The examiner has treated this petition as making five distinct and specific charges against the respondent, viz.: *First*, that the said receiver and his attorneys had deceived and misled this Court, and thereby obtained an order authorizing them to compromise certain suits and claims of the receiver to certain pieces of real estate in Salt Lake City for the sum of $84,666.15, by representing to this Court that said sum was the full value of such real estate, when in truth and in fact it was of the value of $225,000; *second*, fraud and misconduct or gross negligence on the part of the receiver in renting to one William L. Pickard 30,000 sheep at a grossly inadequate price; *third*, fraud and misconduct on the part of the receiver in making a compromise in which he received $75,000 from the defendant for personal property which he was entitled to take into his possession as receiver, and releasing all claim thereto, the said property being of the value of $250,000; *fourth*, fraud and misconduct on the part of the receiver in not taking into his possession large amounts of property in the hands of the defendant corporation or its agents, which it was his duty to do; *fifth*, fraud and misconduct on the part of the receiver and his said attorneys in trying to obtain from said fund in the hands of the receiver exorbitant charges for their services as such.

The petition further states that the receiver has presented a claim for allowance to himself for his individual services as receiver of $25,000, and in addition each of his solicitors presented a claim for $10,000, said claims aggregating $52,865.23; that said claims for allowances were referred to the examiner in this case to take testimony as

to the amount to be allowed; that the United States attorney for Utah and the territorial commissioner of schools both appeared for the receiver in the taking of such testimony, and no one appeared for the United States, or for the said common schools; that on such examination the defendant corporation at first appeared by its solicitors, Messrs. Sheeks and Rawlins, and by them the first witnesses produced by the receiver were cross-examined ; but afterwards, as petitioners are informed and believe, they were instructed by the ·defendants not to cross-examine and not to contest .the claims of the receiver or of his solicitors, and thereupon they ceased to make any further contest, and the examination became and was wholly an *ex parte* examination by the receiver and his solicitors before the referee.

The petition then proceeds to allege that under the law George S. Peters, as United States district attorney, was bound to appear, by virtue of his office, for the United States in all suits to which the United States was a party; and that he was not entitled to have or receive any sum for any services he may have performed as solicitor for the receiver in this case, and that the claim of the said Williams, as solicitor for said receiver, for $10,000, was much too large.

The petition then proceeds, in so many words, to charge as follows: "Your petitioners further represent that the amount, $25,000, claimed by the said receiver for his individual services, is grossly exorbitant, excessive, and unconscionable; that the allowances to the receiver for his services must be only for those rendered by himself, and he cannot be allowed for services for which his agents and employes may be allowed and paid."

The petition further states that the difference between the amount for which the 30,000 sheep, above mentioned, could have been rented and the amount for which they were rented is about $5,000, and that this amount should be deducted from said receiver's compensation, if, in view of his breach of duty, he is entitled to any compensation; and if it be that he so rented said sheep in return for any

benefit to himself, or the hope thereof, then he ought not to receive any compensation, and said contract of renting should be disapproved, and the receiver held for all loss to the fund in consequence of such wrongful renting.

The petition further states that "petitioners are informed and believe that the sum of $75,000, above mentioned, received from the said defendant in compromise for certain property above mentioned, was a grossly inadequate consideration, and the receiver should be held to account to the fund for the difference between $75,000 and a fair consideration for said property; and such difference, your petitioners believe, is not less than $175,000; or that said transaction should be disapproved by the Court, and the receiver held to a strict accountability for all loss in consequence of his wrongful action; and, further, that the receiver should be held accountable for the loss to the fund, and to the common schools, caused by the compromise upon the real estate above mentioned; and this loss, your petitioners charge, on information and belief, is not less than $135,000; and that, further, if said receiver be allowed any compensation at this time, it should not in any view exceed $5,000."

The petition then proceeds to charge that, inasmuch as no one has appeared on behalf of the common schools, the fund is likely to be greatly diminished by said claims made against it, and that the appearance of some one for the common schools is rendered absolutely necessary to the ends of justice; and the facts that the commissioner of common schools of this Territory is employed by said receiver against the interests of said schools, and that the United States' attorney for this Territory is also employed against the common schools, and that the receiver himself is an officer of the United States, and that they are claiming that by a compromise the said schools have already been deprived of a large portion of the proceeds of said lands, and that these proceeds have become the property of the United States—furnish additional reasons for permitting the trustees of district schools to appear in this proceeding. Wherefore the petitioners pray as follows: "That they may be made parties to such proceedings, or

that they may be allowed by their solicitor or otherwise, in order to defend and protect the interests of the common schools they represent, and preserve so much of the funds as may belong to said schools, and that such other trustees of district schools as may wish to come in may also be made parties, or allowed to appear, and that your petitioners may be allowed to produce evidence to prove and substantiate the facts stated in this petition, and that petitioners may have such other and further relief as to equity belongs, and as to this Court may appear to be equitable.    Signed and sworn to by T. C. Bailey, Chairman Board of Trustees, 7th School district.    Rudolph Alff, Chairman Board of Trustees, 8th School district.    J. F. Millspaugh, Secretary Board of Trustees, 12th School district."

Upon the application of the solicitors of said petitioners to be allowed to file said petition in said above entitled cause, to become parties thereto, this Court filed an opinion, written by Henderson, J., in substance as follows: "This is an application of certain school trustees to be allowed to intervene as parties to the case.    We are of opinion that petitioners do not show by their petition any right to intervene as parties.    There is nothing to show that the Government is not disposed to look after the interests of the fund, and the interests of petitioners as school trustees are too remote to be recognized by an order allowing them to intervene.    But the petition which has been read contains charges of a grave and serious nature against the receiver and his attorneys, Messrs. George S. Peters and Parley L. Williams.    The charge has been directly made that the receiver has acted corruptly, and in criminal collusion with the defendants, and that this Court has been imposed upon by the representations of the receiver and his said attorneys, and a fraud thereby accomplished.    If this be true, a crime has been committed, and this Court cannot and will not pass it by without attention, as the action of these officers, charged with a delicate and difficult duty, should be met by responsible accusers, and have the opportunity to confront them. Either the receiver and his attorneys have been guilty of a

crime, or some person or persons are interested in falsely accusing them. This petition, upon being verified and indorsed by some person responsible for the costs which may be incurred, should be received and filed as charges against the receiver and said attorneys, and they should each be required to file their respective answers thereto, so far as the charges of corruption, fraud, and unprofessional conduct are charged against them, respectively, and upon the filing of their answers it should stand referred to an examiner, to take such testimony as is offered, both to sustain and disprove the charges contained in the petition and report the same to this Court on or before the next regular term of this Court. If the charges of corruption and improper conduct are sustained, and the fund in controversy in this case thereby preserved and protected, provisions can hereafter be made for the payment of the expenses incurred; but in the meantime we shall postpone the question of compensation to the receiver and attorneys until the bringing in of the report.

We shall consider the matter in the same order in which the examiner has treated it. And the first in order is the one relating to the charge of misleading the court upon the matter of the compromise of the claim of the receiver to the real estate. The charge in the petition relating to this matter is as follows: 'Your petitioners represent further unto your honors that the late corporation, the Church of Jesus Christ of Latter-Day Saints, after the 1st day of July, 1862, obtained and held in violation of said section 3, and not for purposes of worship of God, or for parsonages or burial grounds, other real estate, to-wit: parts of lots 2 and 7, block 88, plat A, Salt Lake City survey; also all of lot 8, block 76, plat A, Salt Lake City survey; also that portion of lot 5, in block 75, plat A, Salt Lake City survey, commencing at the northwest corner of said lot 5, and running thence south 105 feet one and one-half inches; thence east 324 feet; thence north 105 feet one and one-half inches; thence west 324 feet, to the place of beginning—all of said lands being situated in Salt Lake County, Utah Territory. That on March 23, 1888, April 4, 1888, and May 14, 1888, the said receiver instituted ac-

tions in the Third Judicial District Court of Utah Terri-
tory against various defendants, and in the complaints in
said suits, among other things, alleged that said last above-
described tracts of land were obtained and held by said
late corporation in violation of said section 3 of the act of
July 1, 1862, and not for the purpose of the worship of
God, or of parsonages or burial grounds; and that the
claims of the various defendants in said suits were invalid;
and prayed that the deeds of said various defendants be
held to be colorable, and the cloud upon the title created
by said deeds be removed, and that the possession of said
lands be adjudged to the said receiver for the uses and pur-
poses mentioned in the said section 13 of the act of March.
3, 1887.   That afterwards, on or about the 9th day of July,.
1888, the said receiver and the said defendants to the suits;
above named compromised said suits, and in lieu of said
tracts of land described in said complaints, except a por-
tion of lot 8, in block 76, the said receiver took the sum of
$84,666.15, or a note therefor, to stand in the place thereof,
and to be treated and applied as the land should have been
treated and applied.   That the said solicitors of the said
corporation were the attorneys of said defendants, except
one, in said compromises, and thereby admitted that the
land had been obtained by the late corporation, and was
then held by the defendants for the late corporation, in
violation of said acts of Congress, and that the plaintiff
was entitled to recover if said acts were valid, and in effect
admitted that the money received should be substituted for
said lands, and should be applied for the benefit of said
common schools.   That the order of the court authorizing
the said receiver to compromise said suits was made by the
court, as your petitioners are informed and believe, solely
upon the recommendations of the receiver and his solici-
tors, who stated to the court that the estimates in the peti-
tion for authority to compromise were the actual and reas-
onable values of said tracts under the circumstances, and
that said compromises were fair and reasonable.   Your
petitioners aver, however, that said tracts of land were
worth $225,000, and that $84,666.15 was a grossly inade-
quate valuation of said property; that no evidence was

heard by the court in regard to said compromises, and your petitioners believe that the court was misled by the said representations and recommendations of the receiver and his solicitors, and that said receiver should be held accountable for the loss to the fund and to the common schools caused by the compromise upon the real estate above mentioned, and this loss your petitioners charge on information and belief to be not less than $135,000.'

After reviewing the testimony upon this subject, the examiner reports as follows:    'In making the compromise and presenting it to the court, and in the proceedings in court, the receiver and his attorneys acted in entire good faith, and without any intent to mislead the court, or to conceal or misrepresent any of the facts.    The receiver acted mainly upon the advice of his counsel, and they believed and still believe, the compromise was fair and advantageous to the receiver, and the means and methods of carrying it out by proceedings in court were devised and conducted solely by the counsel of the parties.    The compromise was ratified by the court.    The government was notified, through its law officers, of the compromise, and has made no objection, but through its said officers has expressed approval of it.'

The testimony shows that some time after the appointment of the receiver, and while some proceedings were pending before an examiner, in the testimony there given, the attorneys for the receiver learned facts from which they had a suspicion that the real estimate mentioned was held by the apparent owners thereof in trust for the church.    Acting upon this suspicion, they at once instituted suits for its recovery, alleging that the property was held in secret trust for and belonged to the church.    This was done at that time to prevent by notice *lis pendens* the further complication of the title to said lands.    They thereafter instituted an investigation of the title, and it was found that some of the property had been held by the trustees of the church by deeds which expressly recognized the trust to a certain date, which was long prior to the passage of the act of 1887, and before the appointment of the receiver.    The records then showed that it had been con-

veyed away to individuals. Other portions of the land had
been held by conveyances from the time of its location
and patent by the government by deeds expressing no
trust whatever. The examiner has returned in detail a
statement of the record title to each and every piece of
this real estate. After these suits were instituted it was
claimed by the defendants that, as to some of the pieces of
real estate, they had never belonged to the church at all;
as to others, it was claimed that at some time in the past
they had been the property of the church, but that before
the passage of the act of 1887 they had been sold, and that
the present owners were purchasers and holders thereof in
good faith. It further appears that, upon investigation,
the attorneys for the receiver had become satisfied that, as
to some of this property, the claims set up by the defend-
ant were true; as to others, they had a suspicion yet that
possibly the property was held in secret trust. Other at-
torneys were employed at this time by the receiver, upon
the recommendation of Peters and Williams, who were
regularly retained as his attorneys, and Messrs. Marshall
& Royle were retained to assist in the prosecution of these
two cases. While these cases were pending, and in this
condition, the attorneys for the church claimed that so far
as it was claimed in said suits by the defendants therein
that the church had held the property, and that it had
been conveyed and sold and was then held in good faith
by honest and *bona fide* purchasers, that this claim was
true and admitted, and claimed that the church had re-
ceived this compensation at the time of those several sales,
which was just prior to the passage of the act of 1887;
that the purchase price which it was claimed the church
had received was a reasonably fair valuation at that time;
and thereupon the attorneys for the church offered, in case
said suits were dismissed, that they would turn over to the
receiver the full amount of what they had received; that,
after considerable consultation among the attorneys for the
receiver and a full investigation, it was thought that it was
reasonable and right that they should receive that amount
and dismiss said causes; that it was for the interest of the
Government and the fund in hands of the receiver to make

such compromises. Thereupon a petition was prepared for the purpose of coming to this court, and asking for its advice and direction. This petition recites the commencement of all the cases for the recovery of the real estate. It sets forth in detail the subject of each suit; for what property it was brought; what claim the defendants therein made to it; the particular consideration which it was claimed by the defendants in those cases that they had paid the church for it; and the petition further alleged: 'Your petitioners further represent that, in consideration. of the said litigation and of the claims of the said parties, respectively, with reference to the said transfers and ownership of all of said property, and for the purpose of adjusting and settling the said suits involving the said property which the said defendants in said original suit of the United States of America against the said late corporation of the Church of Jesus Christ of Latter-Day Saints and others have proposed and offered your petitioners by way of compromise and settlement of said suits, and securing the dismissal of the same, to pay your petitioner the following sums of money: *First,* Five thousand five hundred dollars, the alleged consideration received by the said church from the said Angus M. Cannon for the land and premises involved in said suit against him; *second,* The sum of $36,241.15, the amount received by the said church from the sales of those portions of the said lot 8, in block 76, sold and transferred on or about the 2d day of March, 1887; it ·being agreed, however, by the said defendants that this settlement, if approved by the court, shall not include the claim of the petitioner to the northeast corner of said lot 8; *third,* The sum of $42, 925, so received by said late church corporation for the portion of said lot 5, block 75, in plat A, and hereinbefore described. And your petitioner further represents that in his opinion, and as he is advised by his counsel herein, it would be for the best interests of all of the said parties to said original action of the United States against the said late corporation and others to make the said adjustment in said litigation.' Nothing was said in the petition whatever, as to the value of this real estate, but the petition on the other hand, plainly

shows on its face that it was the intention of the receiver and his attorneys to ask the authority of the court to settle those cases upon the basis of what it was claimed the church had received upon a sale thereof.

Upon the presentation of the petition, it being signed by the receiver as petitioner, and indorsed by P. L. Williams, George S. Peters, and Marshall & Royle as his attorneys, and on the oral statement being made in court that it was thought by the attorneys that it was best to make this compromise, the Court at once entered an order authorizing it to be made. So far as this charge is con-cerned against the receiver, it is only necessary to say that the testimony clearly shows that the suits were commenced upon facts that were unascertained by the attorneys themselves, and of which the receiver had but little personal knowledge; that he acted wholly under their advice, and followed implicitly their directions, and this is the only charge that can be made against him. The character of the attorneys employed by the receiver was such that, when this petition was presented to the Court, this Court readily, and without the slightest hesitation, acted upon their advice. It is shown that the receiver did no more than that himself, and it would be useless to think of charging the receiver with wrong-doing in so acting upon the advice and direction of counsel which this Court as readily accepted. The charge could as well be made against the Court.

It remains to be considered, however, as to whether the charge has any merits as against the attorneys. The testimony clearly shows that as for that portion of the. real estate which it was the expectation or hope of the attorneys for the receiver that they might recover, it was a fair and proximate valuation of that real estate on the second day of March, 1887. The examiner in his report has summed up in a very exhaustive and thorough manner the testimony relating to each particular tract of this land, and has divided it into classes, according to the expectation and chances of recovery; and, in concluding, he says: 'The amount accepted was the sum that was represented to have been paid for the lands on the last conveyance,

and approximated the full value of all the pieces expected
to be recovered March 2, 1887.' All of the attorneys who
acted for the receiver in this matter gave testimony upon
the stand, and now say that the compromise was fair, and
that they now advise that it was the best that could be
done. The only circumstance which tends to throw any
suspicion upon the transaction upon its face is the fact
that suits were commenced for an amount of real estate
largely in excess of what was received, but, when it is
shown that much of this property was so situated that in
all probability it could not be recovered (some of it, as the
examiner finds, the attorneys for the receiver before the
compromise had determined to dismiss from the suits),
this circumstance is explained. It must be remembered
that the lands which were being recovered were in the
hands of people who, to say the least, were unfriendly to
these proceedings. The counsel for the receiver had got
to find the testimony upon which the conveyances would
be set aside from these people. The facts were known to
them, and only to them; and, if it be true that the church
had conveyed this property away before the passage of the
act of 1887, and the receiver obtained from them all that
they received for it, and the church was actually divested
of it, it was all that could be required. We think that the
testimony abundantly sustained the examiner in his con-
clusion upon this subject. We believe that the counsel
for the receiver acted in the interest of the fund in making
the compromise.

But it is insisted by counsel that the court was actually
misled, and that, whether the compromise was fair or not,
the attorneys are still guilty of misconduct. The com-
promise was made and was authorized by the Court upon
the allegations in the petition asking for authority to
make it. It is said that there were some statements made
to the Court at the time the order was entered relative to
the value of the property, but the petition on its face
fairly shows that what the receiver was asking was what it
was claimed the church had received upon a sale prior to
March, 1887, and that it was only claimed that they had
received compensation for a part of the land, while the

petition asks for authority to release the claim of the receiver to all the land involved in the suits, and the basis of the compromise was not the value of the land at the time the compromise was entered into. The petition shows upon its face that the receiver was asking for authority to discontinue all the cases, and relinquish all claim to the whole of it, but that he was receiving money on account of only part of it; and it showed just what property the money was to be received upon, and just what the basis of the payments were to be, viz., the amount the church had received upon a sale of that property.

The second charge is that of misconduct of the receiver in renting the sheep to W. L. Pickard at a grossly inadequate price. The allegation in the petition respecting this matter is as follows: 'That since the appointment of said receiver he has obtained possession of 30,000 sheep, the property of the defendant corporation, and after receiving the same he rented them without any authority from this Court, and without public notice, to one W. L. Pickard, a surety upon said receiver's bond, at the rate of 20 cents per head per annum, when the customary price was from 40 to 50 cents per head, and that in said renting of said sheep the fund sustained a loss of about $5,000; that, furthermore, the difference between the amount for which 30,000 sheep above mentioned could have been rented and the amount for which they were rented is about $5,000, as your petitioners are informed and believe, and that this amount should be deducted from said receiver's compensation if, in view of his breaches of duty, he is deemed entitled to any compensation; and if it be that he so rented said sheep in return for any benefit to himself, or in the hope thereof, then he ought not to receive any compensation, and said contract of renting should be disapproved, and the receiver held for losses to the fund in consequence of such wrongful renting.'

The examiner upon this subject finds: 'The proof shows the letter to Pickard was in entire good faith, and in the belief that he was doing the best he could do, and he understood Pickard to be amply responsible finan-

cially. Considering the rule that a receiver is to provide for absolute safety, so far as he can, rather than to make profits; that he is debarred from ordinary business risks not forced upon him; and the circumstances that surrounded him at the time—the transaction does not afford any evidence of bad faith or dishonest intent.'

The testimony upon this subject is very voluminous, and is quite conflicting, but it fairly tends to show that the sheep that were received by the receiver were much below the average of sheep in this Territory. They were culled from many flocks. They were the result of the tithings collected by the church, and, as many witnesses testified, it was not customary for persons paying tithing to pick out and pay the best of their flocks, but, on the other hand, rather the poorer. These sheep were in the hands of many persons, scattered all over the Territory, and the receiver in getting them received an order from the church upon the various persons who held them; and when he presented himself for the purpose of receiving the sheep, and sheep were pointed out as being the church sheep, and turned over to him, he had no way of disputing the claims made by the persons having them in charge. It is not to be supposed that under such circumstances persons who were turning out sheep to the receiver would be careful to turn out the best of their flocks. After gathering these sheep, the question of their renting had to be considered by him. The ordinary custom in the country was to rent the sheep for a longer period than one year. This the receiver did not feel authorized to do. The custom also was to rent the sheep, the rent to be paid in kind—that is, a percentage of increase—and so many pounds of wool per head, and the rental which the owner would realize always depended upon the value of sheep and wool in the future. The testimony tended to show that in years past, at the rate that sheep could thus be rented, owners would get all the way from 25 to 50 cents per head, but it was plainly shown by the evidence that the industry was depressed in the summer and fall of 1888. Rentals for cash were rare. Some few small flocks were rented by the receiver after the old custom of so many pounds of wool and a certain number

of lambs for increase, but, after making these contracts, the receiver sought to dispose of the entire flock for a cash rental, and to some responsible party.   It must be remembered, as stated by the examiner, that a receiver is but a stakeholder; that it is not his duty to assume ordinary business risks.   Absolute safety is to be aimed at, and not only that, but the property should be sought to be put in such a shape as to lessen the expense of care and oversight. If the receiver could make a rental of these sheep to one individual, with whom he was well acquainted, and whom he knew to be prompt, honest and responsible, and that there would be no doubt about realizing upon his contract, and that it would not require looking after, it would be much better than to undertake to rent these sheep in small flocks and herds all over the Territory, where it would require constant care and watching to look after the responsibility of those to whose custody they were committed, and at the end of the lease to be present by himself or his agents to receive the property back again.   With this view it is shown that he made application to Mr. Pickard, who was known to be in the business, and responsible.   Mr. Pickard made the offer of 18 cents per head, the receiver offering to rent them at 25.   The entire flock contained no bucks.   As before stated, they were of an inferior quality. They were to be rented but for a single year.   They were to be rented upon terms that would require the person renting them to return in kind as good sheep at the expiration of the lease, and that he should pay a cash rental per head.   The lease was finally made out at 20 cents.   A great number of practical sheep men testify before the examiner that this was a fair rental, considering all the circumstances, many witnesses placing it from 20 to 30 cents per head; and many witnesses testify that, if the rent had been made to be received in wool and increase, it would have amounted to much more.   But in view of all the circumstances, and of the duties of a receiver who is merely holding the property to await the final result of the litigation, we think that the contract made with Pickard was a fair one, and there is no testimony whatever in the record which even tends to show that there was any

fraud, or that the receiver was to receive any consideration other than what is expressed in his contract, and that no favor was extended to Pickard on account of friendship, or his relation to the receiver in any manner. It is claimed that the receiver has been guilty of gross negligence in the matter, because, it is said, by the strict terms of the contract, it does not require Mr. Pickard to return absolutely the full number of sheep received by him. It is unnecessary to consider this, because, in view of this criticism, an affidavit has been filed in the case made by Mr. Pickard in which he states that those were the terms of the contract as it was entered into, and, if there was any error in reducing it to writing, it is a mere error, and nothing else; and, if necessary, upon the admissions made by Mr. Pickard in the affidavit above referred to, a court of equity would be fully authorized to make the correction. The examiner finds, and the testimony supports the finding, that these sheep were worth not to exceed $1.50 a head. The rate at which they were rented by the receiver yields between 13 and 14 per cent. per annum upon this valuation.

The third charge is that the receiver was guilty of fraud and misconduct in compromising for $75,000, $250,000 worth of property. The charge, as contained in the petition, is as follows: 'Your petitioner further represent that the said receiver now has in his possession the sum of $75,000, received in compromise for cattle and other property; that said property, as your petitioners are informed and believe, was worth at the time $250,000; that it was estimated by the parties to this suit in a stipulation of facts made October 19, 1887, to be worth the sum of $268,982.15; and that this transaction between the receiver and the defendant corporation was made without authority from this Court; and your petitioners are further informed and believe that the sum of $75,000, above mentioned, and received from the said defendant in compromise for certain property above mentioned, was a grossly inadequate consideration, and the receiver should be held to account to the fund for the difference between $75,000 and a fair consideration for said property, and such difference your petitioners believe is not less than

$175,000; or that such transaction should be disapproved
by the Court, and the receiver held to a strict accountabil-
ity for all loss in consequence of his wrongful action.'
We have examined the testimony upon this subject, and
the statement contained in the examiner's report as to
what it establishes.   We fully concur with him in his de-
termination upon this point.   We can do no better in
stating the substance of the testimony upon this point
than to adopt what he has said, which is as follows:    ' On
the motion for the appointment of a receiver it appeared
that seventeen or more stake incorporations had been
organized in Utah prior to March 3, 1887, and that on
February 28, 1887, the church had assigned to these local
corporations personal property to the amount of about
$269,000, and the gross value of the property assigned to
each stake was set forth, but there was no inventory or
disclosures to show of what the property consisted.   In
April, 1888, in proceedings in the main cause, these in-
ventories were disclosed, and it appeared that they were
taken shortly before February 28, 1887, for the purpose of
the transfers.   The property consisted of hay, grain, mer-
chandise, tithing-house supplies, office furniture and
fixtures. and a great variety of property in the various
stakes; including $65,736 in cattle, $19,869 in horses, and
$14,514 in sheep.   In some stakes the property was in
more than one place, and in as many places as there was
tithing-houses.   At these places tithing was continually
received and dealt out, and the kind and amounts received,
and the proportion between receipts and disposals varied
with the season of the year and the nature of the property;
but receipts were larger in the fall and winter, and
the stock on hand increased during the summer.   In
places where temple building was in progress, these
supplies were used as far as available for such purposes,
and when the property received was in excess of local
demand it was sent to market.   After March 3, 1887,
the tithing system was continued in the usual way,
and every town had its local corporation.   Tithing was
received, intermingled with old stock, and sales were
made from the stores.   Perishable property was speedily

disposed of, and such products as were usually sold or consumed annually were disposed of during the year. Considerable of this property was disposed of before the appointment of a receiver, but even its approximate proportion and value cannot be stated. In a general way, it appears that not over a quarter in value was on hand in May, 1888, and it is stated the value of property on hand would not, on July 9, 1888, exceed $50,000. The general course of the business would require the disposition of the personal property mentioned—supplies and property of annual products. The only inference that appears from the whole testimony is that much, if not all the cattle, sheep, and horses in these inventories were on hand for supplies, or working at the various places, and not as herds, though this is not shown by any direct evidence. After the receiver got the inventories, he, with one of his attorneys and an assistant, went to two or three of the places, and demanded property. Except some office furniture, not valued, he could not identify any of the property. An agent was sent to two or three other stakes, with like results. The evidence satisfies me that efforts to reclaim the property *in specie* at any time after the appointment of the receiver would have been attended with much cost and doubtful results. The receiver's attorneys examined the stake incorporations' papers, and concluded the incorporations were illegal, and would not be recognized as capable of holding property by the courts, and they also considered that there was a cause of action against any party who converted the property after March 3, 1887, but in most instances they failed to find parties liable and financially responsible. In Salt Lake county, after some doubts as to the methods of procedure, the government obtained a writ of assistance in the main action, and recovered some property, and this method of procedure was sustained by the Supreme Court by a majority opinion. The difficulty of finding property in other stakes prevented the further use of this remedy. The receiver, by the advice of his counsel, compromised the claims to this property for the sum of $75,000, payable in cattle at the inventoried price in the transfer to the

stakes, and, in case the church did not turn out sufficient cattle, the deficiency was to be paid in cash.   The church collected about 2,000 head, of which 1,000 or 1,100 were collected near the Pipe Spring ranch, in northern Arizona, and the remainder near Oxford, Idaho, from the Star Valley ranch.   The receiver ascertained the herd in Arizona had been culled, and that the cattle offered were worth only about $13 per head, and he refused to receive them, and the $75,000 was paid in cash.   His agent did not, so far as the testimony shows, see the cattle in Idaho. The receiver in his report shows that he had the $75,000 on hand as cash, but no special report was made showing the compromise, or the sources from which the money was received.   It was, however, a matter of general knowledge, and there was no effort or intent to conceal the facts.   The law officers of the United States were informed of the facts, made no objection, and approved the compromise.   The receiver in this case acted with the advice of his counsel, and they believed and now believe, it was an advantageous compromise.   It was made in good faith by all the parties.   It may be further said that the testimony shows that the attorneys for the government in the main case were fully aware of this compromise before it was made.   The stipulation referred to in the petition, in which it is claimed that it was stipulated that the property in the hands of the church was worth $268,000, was one that was used upon motion for the appointment of a receiver.   Upon that hearing it was sought by the government to show that there was some property in existence which it was claimed that a receiver would have the right to take into his possession.   As a basis for argument that a receiver should be appointed, it was then stipulated that, for the purpose of the motion, but for no other purpose in the case, it should be stipulated and agreed that this property, which was transferred by the church to the various stake incorporations at the time of such transfer, was of the value stated.   The various schedules of the property finally came into the hands of the receiver as stated by the examiner in April, 1888, and from these schedules, which are before me, it would be im-

possible for any person to identify the property. It was scattered all over the Territory. It consisted of all kinds of property, from household furniture to stock. It is apparent that if the receiver had tried to recover this property it would have resulted in vast expense, and that if he had succeeded, which, it must be admitted was, in a great proportion, at least, impossible, it would have been in his hands but of little value as compared to the inventoried price.

As to the charge that the receiver has failed to take possession of the property which belonged to the late corporation, the petition contains the following: 'Your petitioners further represent that they are informed and believe that there is property to a large amount, of which said receiver has not taken possession, that was owned by said defendant corporation and was in possession of its agents or of others for said corporation after said receiver qualified; and that he could have taken or obtained possession of said property by the use of reasonable diligence as receiver, and that his failure to do so was from want of attention to his duties as receiver or from willful negligence, or through combination with the agents of the late corporation.' At the close of a review of the testimony bearing upon this subject, the examiner concludes as follows: 'It is impossible to summarize all the details, but, taking all the testimony and circumstances, the extent of territory, the variety and magnitude of church affairs, the devices to conceal its effects, the length of time it had to prepare for the law and suits under it, the testimony shows no intentional omission of the receiver to take possession of the property, or that he acted otherwise than in good faith.' The testimony upon this subject shows that there is considerable real estate—some at Logan, some at Ogden, and some in other portions of the Territory—which belonged to the church previous to March 3, 1887, and was conveyed by the church just prior to that time to the local stake organizations, and that these organizations now hold the same, using it for church purposes, and claiming to own it. This was known to the receiver and his attorneys, and they claimed that it

should pass to the receiver, and demand was made accordingly for it; but no other steps were taken to reduce it to possession than to commence three actions in the First District Court at Ogden for the recovery of a portion thereof. These suits are still pending, and were brought, as the attorneys for the receiver testify, for the purpose of testing the question as to whether they could recover for such property, and that they delayed bringing suit for the other property to await the determination of these cases, and that it is their intention to press these cases to judgment as test cases; that the reason they had not commenced other suits is that the real estate could not be disposed of so but that it could be reached by such suits. As to personal property, the only testimony tending to show that the receiver has failed to take possession of personal property is that cattle and horses were known to be running at large on the range in the vicinity of what had been church ranches, with the church brand upon them, and reputed to be church property; but this fact is explained when it is remembered that a large amount of horses and cattle was gathered together for the purpose of delivery to the receiver under the conditions of his compromise, and that he refused to receive it, receiving its equivalent in money. There is no testimony to show that the property is other than such as was thus compromised. Some of the exceptions taken to this part of the report are based upon the idea that the receiver is concluded by the final decree in the case from further pursuing any property that was not in his hands at the time the decree was entered. The testimony shows conclusively that this was not the understanding of the receiver or his attorneys, but it is unnecessary for us to determine what the effect of the final decree in this respect is, because the receiver had nothing to do with that part of the case. If it should be admitted that such a decree has been entered in this case, .it cannot be charged to the receiver. We think the testimony fully warranted the finding upon this subject.

As to the charge that the receiver was seeking to obtain a fraudulent or unconscionable compensation out of the fund in his hands, the petition, in effect, charges that a

reference had been made by this court to an examiner to take testimony, and report it to this court, as to the amount of compensation to be paid to the receiver and his attorneys for their services; that upon the hearing before this examiner the receiver had made claim for $25,000; that P. L. Williams, one of the attorneys, was the commissioner of schools for this territory, and·was acting as attorney for the receiver, and against the interest of the school fund; that Mr. Peters was the United States district attorney for this territory, and that he was acting in his own interest and in the interest of the receiver upon such examination, and against the interest of the school fund; that the defendants in the main suit had been induced to withdraw all objection to the allowance of the claim of the receiver; that the examination, therefore, became *ex parte;* and, further, that the amount of the compensation "claimed by the receiver is grossly exorbitant, excessive, and unconscionable." The report of the proceedings and testimony before the examiner, which is before us, shows that there was much contention between the parties as to the scope and meaning of the order of reference upon the matter, and of the charge in the petition. The examiner was right in holding and construing our reference to him upon this subject to be an examination into the action of the receiver in the sense of wrong-doing.

It is claimed by the attorneys prosecuting the examination, first, that the testimony shows that the receiver, in his testimony before Examiner Sprague, in many cases magnified his services as receiver, and stated them unfairly, intending to deceive and mislead the examiner and the court, and that other witnesses called for the receiver were asked to estimate, and did estimate, the value of his services upon the theory that his testimony was true, and that by·that means the examiner was influenced and induced to report his findings that from the evidence the receiver should be paid $25,000 for his services. If this were true, it would amount to a fraudulent and unconscionable claim for compensation. It would be seeking to defraud the fund, and using his office for the purpose of accomplishing it. It was claimed, further, that, upon this

examination, it was proper for the examiner to consider what would be a reasonable compensation; and that, if the receiver had made a claim or stated before the commissioner that he believed his services were worth a certain amount, and that proved to be largely in excess of what the commissioner thought he should have, that would amount to a fraudulent and unconscionable claim for compensation. It was not the intention by this reference to submit any such question to the examiner, and, as stated by him, in reply to this claim, the question had been expressly referred to an examiner before that time. His report was then on file, and it had not been heard by the court, and it was not intended to re-refer the subject to another examiner. An excessive charge is not necessarily a fraudulent charge. The amount which should be paid for services depends upon the view the person estimating takes of the basis upon which it should be assessed. If, in this case, the compensation of the receiver and his attorneys was to be assessed wholly and entirely from the stand-point of the Government, and it was to be considered that the Government had acquired by these proceedings a vast amount of property for which it had given no equivalent, and that the sum thus acquired was largely due to the activity and energy of the receiver, and the fees and expenses were based upon the idea of the acquisition of this property, then it might be estimated in one way. The idea of liberality on the part of the party acquiring the property might be considered. If, on the other hand, it is to be considered from the stand-point of perfect impartiality between all the parties, and in view of the fact that the law under which these proceedings are had is part of a system by which the Government is taking property which has been accumulated by a corporation in violation of law, and simply divert it into other channels, in which it is supposed that the parties from whom the property is taken will yet receive benefit from it, simply turning the property into other channels, and for the purpose of effectuating and carrying out a Governmental policy on account of the peculiar local conditions in this territory, under conditions that are exceptional, and that all laws which bear

upon this subject should be carefully executed, and in such a way as not to carry with it the slightest imputation or even appearance of peculation or the suggestion of gain on the part of parties who accept responsible positions and places of trust under it, then a person estimating the services might estimate differently; and, in any event, it is not a mere question of the opinion of persons as to the amount of compensation, and nobody could be charged with fraud for having an excessive and extravagant opinion on that subject. The subject we intended to refer was as to whether the receiver and his attorneys had been guilty of official misconduct; whether they had been using their positions in the case—their relations to it as officers of the court—to defraud the fund. The testimony shows that previous to the presentation of this petition an order had been made by this court referring the subject of compensation to E. T. Sprague, as examiner of the court, to take testimony upon that subject, and report it; that Mr. Dyer appeared before that examiner, and testified as to the services performed by him; and he was asked the question as to what he considered his services were worth, and he answered that he considered them worth at least $25,000. This is the only claim that he has made. He produced other witnesses upon the stand of known respectability and high business standing, and his testimony as to the work he had done was stated to these witnesses as an hypothesis upon which they were asked to give their opinion as to the value of the services, and they gave their opinion as to what the services were worth; placing it, variously, from $20,000 to $35,000 or $40,000. Mr. Williams appeared upon the examination in the interest of both himself and Mr. Dyer. Mr. Peters had previously withdrawn from the service of the receiver, and appeared in the interest of the Government, but it is in evidence that he had notified the department of justice that this examination was pending, and of the time when it would take place, and of the fact that he himself had a charge which was then being examined; that he had before this time been acting for the receiver, and that, on account of this delicate situation, he did not wish to appear actively upon that examination, in the in-

terest of the Government; and, when the examination was closed, he reserved the right to the officers of the Government to take further testimony, if they should desire to do so. It appears that the receiver, prior to this examination, had made application to the attorneys for the defendants in the main suit to know what they considered his services worth, and that they had said that they would not contest an allowance to him of $25,000. This was upon the theory, as stated by them in their testimony, that they had no interest in that matter, because if they lost in the litigation they could have no interest, and if they succeeded the government would make good to them any loss to the fund; that the receiver then presented this consent and certain affidavits and letters from business men to the attorney general at Washington; that the attorney general refused to make any arrangement about the amount of fees, and that the matter was referred back to the Court. It must be remembered the receiver was acting as the officer of this Court, and under its appointment; that he did not stand to the Court in the attitude that he would to a private person; that he owed to the Court absolute good faith in disclosing what he had done, and all the facts bearing upon it, but an over estimate of the amount that he was entitled to was something that would not in any way bind the Court; that this Court had the right absolutely to fix his compensation, from which there could be no appeal; so that there was no danger that the authority with whom he was dealing could be overreached or in any manner overcome by threatened litigation. The examiner has found that there was no fraudulent claim for compensation made. He finds that the facts stated by the receiver as to his services before Examiner Sprague were substantially correct, and he has not found, but expressly refuses to find or enter into the subject of, what a fair and reasonable compensation is; and in this he was correct, because it is not a matter that was submitted to him.

In addition to these charges which have been specifically set forth and considered, the petition, at least by inference, charges that Mr. Williams, being commissioner of schools for this territory, was engaged as attorney for the receiver

against the interests of the schools; that Mr. Peters, being United States district attorney for this territory, in acting as attorney for the receiver was guilty of acting against the interests of his clients, and that he had no right to enter upon such duties, and no right to any compensation whatever; and that, the receiver being United States marshal of the territory, there was at least connivance between them to uphold and advance the interests of each other as against the fund. The testimony shows that in employing Mr. Williams the receiver did not have in mind at all the fact that he was commissioner of schools, but that he employed him solely on account of his high professional standing and good character as a citizen. It further shows that Mr. Peters had assisted the attorney general in the presentation of the main case, and appeared before this court for the government, and argued in its behalf the motion for the appointment of a receiver. After the receiver was appointed Mr. Dyer applied to him to enter into his employ as counsel; for the reason that, having been employed in the main case, he had become familiar with the object and intent of the law, and to some extent of the duties that would devolve upon a receiver, but that Mr. Peters refused to enter upon such employment without the consent of the attorney general. It further shows that Mr. Dyer made application to the attorney general of the United States for permission to employ Mr. Peters, and that that permission was given, and that thereupon Mr. Peters accepted the employment; that, after the final decree had been entered in this case, Mr. Peters withdrew from that employment; that he kept the government fully advised of the fact of such employment, and of the action taken by him in relation to it. We think the conduct of the receiver, acting under the advice of the counsel he employed and the results attained, and the manner in which the business has been conducted, has fully justified the judgment of the receiver in employing them. When the receiver in this case was appointed in October, 1887, the defendant the church had, some nine months before apparently, and as was claimed, divested itself of all property rights. The property which it was

supposed actually belonged to it was in the hands of persons favorable to the defendant, and who regarded the legislation under which the receiver was appointed as harsh, unfair and unjust. They were acting together under an organization which for completeness is unequaled. The duty confronted the receiver, under these circumstances, to accumulate and get hold of the property. Every step that was taken in this direction required care and consideration, but the business has been so conducted, under the advice and direction of his attorneys, that, with but little litigation, a fund of between $700,000 and 800,000 has been collected, and is in the receiver's hands. Precipitate and ill-advised action could easily have precipitated difficulty and expense which would have rendered the whole proceeding abortive. The testimony taken upon this examination shows, as we think, that these duties have been performed with the very best of discretion, and in the interest of all concerned, and we have no hesitancy in saying that their action in the matter, so far as any charges that are contained in the petition are concerned, is fully vindicated, and the conclusion of the examiner that there was no fraud, corruption, misconduct, or fraudulent and unconscionable claims or charges for compensation, or unprofessional conduct on the part of the receiver or his attorneys, in respect to any of the transactions set forth or contained in the petition, should be affirmed by this court.

We are not unmindful that the learned examiner, whose report is before us, accepted the appointment in this case at the earnest solicitation of the Court, and upon the suggestion and consent of all the parties concerned, and that it was accepted by him upon such request and consent, and by reason of it, and not for the compensation that it would afford; and we extend to him the thanks of the Court for giving to the case his high standing, learning, and ability. He has performed the duties assigned to him with great skill, and in a manner wholly and entirely satisfactory to the Court. The counsel appointed by the Court, and who have acted as *amici curiæ*, have performed their duties in a manner satisfactory to the Court, and an

order should be entered directing the receiver to pay each of them the sum of $250 for their services, and to the examiner the sum of $400, and their receipts will be vouchers in his hands as a charge against the fund. Other expenses of the investigation proper to be charged to the. fund in controversy will be allowed and ordered paid, upon being properly verified and presented. An order should be entered confirming the report of the examiner, and overruling the exceptions thereto.

SANDFORD, C. J., and JUDD, J., concurred.

BOREMAN, J., concurred, and said: Upon the order upon which the examination has been made, and upon the facts as proved, I deem the findings are supported by the evidence, so far as I have been able to examine the proofs.

In regard to the compensation to be allowed to the receiver and his attorneys the following opinion was delivered:

RECEIVER—COMPENSATION—Ten thousand dollars is a reasonable sum to be allowed the receiver in this case for his services, it appearing that he has handled property to the amount of $750,000, consisting of real estate acquired without trouble, and personal property obtained with little difficulty, chiefly by way of compromise, and that the most of the work had been done by his attorneys and that it was little trouble in caring for the property, and that his active duties covered only a year.

ID.—COMPENSATION TO ATTORNEYS—Five thousand dollars is a proper allowance to the principal attorney for the receiver for one year's services, and four thousand dollars is sufficient for his other attorney, who at the same time was United States district attorney and receiving a salary to represent the government.

*Mr. Henry W. Hobson* for plaintiff.

*Mr. O. W. Powers* and *Mr. J. R. McBride* for the receiver and his attorneys.

JUDD, J.:

Sufficient appears in this case to show that in March, 1887, the congress of the United States passed an act, the seventeenth section of which is as follows: " That the acts of the legislative assembly of the territory of Utah, incorporating, continuing, or providing for the corporation known as the ' Church of Jesus Christ of Latter-Day Saints,' and the ordinance of the so-called general assembly of Deseret, incorporating the Church of Jesus Christ of Latter-Day Saints, so far as the same may now have legal force and validity, are hereby disapproved and annulled; and the said corporation, in so far as it may now have or pretend to have any legal existence, is hereby dissolved; that it shall be the duty of the attorney general of the United States to cause such proceedings to be taken in the Supreme Court of the territory of Utah as shall be proper to execute the foregoing provisions of this section, and to wind up the affairs of the said corporation conformably to law; and in such proceedings the Court shall have power, and it shall be its duty, to make such decree or decrees as shall be proper to effectuate the transfer of the title to real property now held and used by said corporation for places of worship, and parsonages connected therewith, and burial grounds, and of the description mentioned in the proviso to section 13 of this act, and in section 26 of this act; and, for the purpose of this section, said Court shall have all the powers of a court of equity." In pursuance of the duty imposed by said section, the attorney general of the United States caused a bill to be filed in this Court on the 30th day of July, 1887, and upon the filing of the bill such proceedings were had as resulted. November 7, 1887, in the following decree: " This day this cause came on further to be heard, and for the appointment of a reciver herein conformably to the former order of this Court; and thereupon the Court, being fully advised in the premises, hereby orders and adjudges that Frank H. Dyer, Esquire, of Salt Lake, in the said territory of Utah, be, and he hereby is, appointed receiver of the defendant, the late corporation of the Church of Jesus Christ of Latter-Day Saints, and of all its debts and property, real,

personal, and mixed, of every nature, kind, and description whatsoever, including any and all equitable interests which it may have to any thereof." The receiver, Dyer, in due time executed his bond in the sum of $250,000, and set about possessing himself of the property, both real and personal, of the defunct corporation.

When the receiver had been in office for about one year he came into this Court, and asked for and procured an order, making a special reference to E. T. Sprague, as master in chancery, to examine and pass upon the receipts and expenditures of the said receiver, and to take proof and report what would be a reasonable allowance to him and his two attorneys, P. L. Williams and George S. Peters, for their respective services done and performed in behalf of such receivership. In pursuance of this order, such proceedings were had before the master, Sprague, as resulted in the taking of a large amount of proof, upon which he made his report to this Court, fixing the compensation of the receiver at the sum of $25,000, and that of each of his attorneys at $10,000. The master also reported in favor of allowing to the receiver, after passing upon his accounts, his expenditures, stated to be $7,865.63. Exceptions to this report were filed by the complainant, the United States; and, upon such report and exceptions, the cause, on a former day of this Court, was elaborately and ably argued by counsel for both sides; and we come now, after the fullest consideration we have been able to give to the cause, to announce the result of our conclusions.

The report of the receiver, filed with us, and which is appended to this opinion as a part of the same, shows that prior to October 31, 1888, there had come to his hands, of the derelict assets of the defunct corporation, real estate situated in the city of Salt Lake, and other places in the territory, aggregating in value the sum of $285,000; and that in like manner there have come into his hands moneys and various kinds of personal property of the value of $439,788.38—making the aggregate sum of $724,788.38. It should be stated that a small portion of this aggregate sum came to his hands between the 31st day of October last named and the 31st day of January, 1889. In this

aggregate sum are included accretions of various kinds, including rent of sheep not yet due, dividends, interest, rents of lands, etc., aggregating the sum of $29,188.92.

Much evidence has been taken by the receiver, and is here submitted as a part of his report by the master. The witnesses, who are shown to be business men of great experience and high character, when interrogated as to their estimate of the value of the services of the receiver, put it, some of them, at a per cent. upon the property held by the receiver, and others at a lumping sum. They take into their calculations, some of them, the trouble that the receiver had to acquire possession of the property, the amount of bond he had to give, and the responsibility attached to holding and keeping so large an amount of property; and yet others think he should be paid for what they termed the "odium" attaching to his position as receiver—meaning by that, as it seems, that because the congress of the United States has dismantled this corporation, and provided for the escheat of the property which it held contrary to law, that it was odious. It is sufficient of this to say that this Court, sitting here to administer the laws of the government of the United States, will not only not act upon, but will not tolerate, any such suggestion as the basis of its decision.

It has been strongly urged upon us by counsel at the bar that we ought to act upon the opinions of these witnesses, and fix the compensation of the receiver at the sum of $25,000. We do not think so. The facts upon which those gentlemen base their opinion are in record, and are as fully before us as they were before them; and, after a thorough examination of the cases upon this subject, no case has been found in which the Court contented itself with blindly following the opinions of witnesses in fixing the compensation of its receiver. One of the best considered cases to which our attention has been called is the case of *Trust Co. v. Railroad Co.*, 32 Fed. Rep. 187. At page 191, in speaking of this matter of fixing the compensation of the receiver, the Court uses this language: "They are all witnesses whose opinions are entitled to the highest respect on account of their characters, their

abilities, and their experience; and yet the very differences that exist between them show that there is no fixed standard or rule to guide us, and that we must fall back at last upon our own judgment of what, under the circumstances, would be fair and reasonable compensation for the services." This language is well adapted to the case in hand. The witnesses in this case variously estimate the services of the receiver, running from the sum of $20,000 to $35,000, or upwards. We conceive the true rule of law to be in all cases that the Court shall look to all the circumstances of the case, such as the amount of property to be handled, kept, and cared for; the difficulty or ease with which the receiver got the same in hand; the kind and character of the property; the amount of bond required; the business character and integrity required for the work; and, finally, the manner in which the trust has been executed; and then say what would be a reasonable and fair allowance, keeping in mind that the "laborer is worthy of his hire," and that extravagance is to be avoided, Testing this case by the rule announced, we have had no difficulty in coming to a conclusion that is entirely satisfactory. More than one-third of this property is real estate, which requires but little trouble to care for. Most of the cash in hand, as well as the other personal property, was acquired with but little litigation; indeed, we may say, without any. The sheep were at once leased out by contracts that fully acquit the receiver of any responsibility or trouble during their existence, and compel the lessees to return a like number and quality of sheep. The money is in the banks, and the dividends upon the stocks are easily collected. The active duties of the receiver, with reference to his trust, for the most part ceased at the entering of the final decree, since which time he has been but little else than a stakeholder. We think the proper way to fix compensation in this case is not by a per cent., but by a salary; and we have determined to fix it for one year, dating from the time of the appointment; and we think that $10,000 for that year is a fair and reasonable allowance, under the rule laid down in this opinion. With this we are entirely content. We do not intend by this to

be bound as to what allowance we will make for services performed after the time covered by this allowance; but in the future, as in this case, we will be governed by what may seem to us proper, under all the circumstances. We can say for this receiver that, so far as we can see, he has brought to his aid a full measure of ability and integrity in the management of his trust, and we have no doubt that his past conduct will prove a voucher for the future.

So far as the compensation of the receiver's counsel is concerned, much of what has been said applies to them. The law is elementary that the fixing of fees between client and attorney in cases of this kind is peculiarly the province of the Court. So jealous are Courts of this matter that, even in cases where the client contracts to pay the attorney a fixed amount, in writing, the Court will inquire into its reasonableness. *Hornberger v. Bank,* 4 Cold. 531. In this case the Supreme Court of Tennessee, upon full hearing, took the responsibility of cutting off about two-thirds of the fees claimed under a written contract, because the claim was deemed by the Court to be unreasonable. The facts as to the attorneys in this case show that their active duties, except to give advice, virtually ceased at the "compromise," as it is called, in July, 1888; and that in the most difficult part of the litigation they had the aid of another firm of lawyers, equal in ability to any in the Territory. We think that for the year beginning with the appointment of the receiver, $5,500 would be a fair and reasonable compensation for the services of Mr. Williams. The receiver states in his testimony that Mr. Williams was his principal attorney, and that he employed Mr. Peters to assist him. This may not be the exact language, but the proof substantially shows that Williams was the principal counsel. In fixing Mr. Peter's allowance, we do not lose sight of the fact that much, if not, indeed, the principal part, of his time, was given to his official duties as district attorney for this Territory. His services ceased, too, at the entering of the final decree in the cause. Looking to the whole case, we think that $4,000 is a fair and reasonable allowance to him. Of course, this is not intended to

cover whatever charge he may see proper to make for any services he may have performed for the Government, as its counsel in the original case. That will be the subject of a settlement between him and the Government; which, if the Government finally succeed in recovering the property in the hands of the receiver, he can be paid out of the property so recovered. The case of *Adams v. Woods*, 8 Cal. 306, cited to us as an authority why the receiver could not employ Mr. Peters, is not in point. Those cases and others of the kind all go upon the idea that there was a conflict of interest. In this case there is not only no conflict of interest, but the interests of the United States and the receiver are in exact harmony, and there was no impropriety whatever in the receiver employing Peters. The sums fixed in this opinion, namely, $10,000 to the receiver, $5,500 to Mr. Williams, and $4,000 to Mr. Peters, and the disbursements of $7,865.63, making the aggregate sum of $27,365.63, will be paid by the receiver; and the same shall be allowed to him as credits upon his accounts as receiver in this cause. A decree will be drawn and entered in conformity with this opinion.

SANDFORD, C. J., and HENDERSON, J., and BOREMAN, J., concurred.

The question of the contempt of the school trustees having been reserved now came up for decision.

Messrs. *Zane* and *Zane* and *R. N. Baskin* for the school trustees argued that the statements contained in the writing were exactly true, and the examination had shown them to be true. It had been shown that every statement contained in their petition was fully sustained by the evidence, yet that those statements contained no charges of corruption or fraud or wilful misconduct or of a fraudulent and at the same time unconcionable claim. Yet owing to that evidence, the Court had cut down the compensation claimed by the receiver from $25,000 to $10,000 and that claimed by each of his attorneys from $10,000 to $5,500 to one and $4,000 to the other. By

saving the fund the sum of $25,500, the trustees had performed a great public benefit and their object was fully satisfied. They made a full disclaimer of any intention to reflect upon or insult the Court, but that they simply tried to state what they considered the facts.

JUDD, J.:

Upon a former day of this Court, T. C. Bailey, Rudolph Alff, J. F. Millspaugh, and L. U. Colbath came into this Court with a paper writing, which was read to the Court by their counsel, and which at that time was taken under advisement by the Court, said paper writing purporting upon their part to be a withdrawal from an investigation, which they had instituted under a petition theretofore filed by them in this cause. After full consideration by the Court, at a subsequent day, an opinion was delivered which held that the paper referred to was a contemptuous proceeding, and that the parties who signed the same were guilty of contempt in the face of the Court. The opinion so rendered is now upon the files of this Court in this case, and is referred to as showing the action of the Court. An order was thereupon entered in pursuance of the opinion, as follows: "In this case it is ordered that the clerk of this Court issue a written notice to each of the persons, Rudolph Alff, J. F. Millspaugh, L. U. Colbath and T. C. Bailey, requiring them to appear before this Court on January 30, 1889, at 10 o'clock A. M., to show cause why they should not be punished for their contempt; and in case they fail to appear, the clerk will issue writs of attachment for their arrest, and to bring them forthwith before this Court." In accordance with that judgment the order therein directed was issued, and the parties on the 30th day of January, came into Court, and filed their sworn answer, in which they set out much matter that is wholly irrelevant to the judgment they were called upon to answer, but, among other things, they say: "Your petitioners further represent that they have acted in the best of faith throughout this whole proceeding; that they have tried to the best of their ability to do their

duty, and consciously have made no attempt to trifle with the Court; that they believed the statements made by them to the Court to be true; that they did not think nor believe, nor had they the slightest conception, that those statements were scurrilous, disrespectful, insolent, or contemptuous in any particular; that nothing was further from their minds than the making of any insinuation or charge against the Court, or of stating anything that would be considered contemptuous by the Court." It then prayed that they might be discharged from such contempt proceeding.

Upon the request by the defendants that they might be heard in their behalf before the Court, opportunity has been given to them, and the case has been ably, earnestly, and respectfully submitted before this Court by two able counsel. It will be seen, however, that, although the argument of counsel has taken a wide range, the direct question before the Court is the proper construction of the paper filed before this Court, which is fully set out in the opinion heretofore referred to. The good faith of the defendants is asserted by their counsel with much energy and confidence. Still, however, notwithstanding their good faith, they are responsible for the language used by them in any proceeding which they may bring into this Court, and it is not for them, nor their counsel to construe or to say what effect such language will have. This direct question came before the Supreme Court of California in the case of *McCormick v. Sheridan*, 20 Pac. Rep. 24. In that case the Court show that "a petition for rehearing stated that 'how or why the honorable commissioner should have so effectually and substantially ignored and disregarded the uncontradicted testimony, * * * we do not know. * * * It seems that neither the transcript nor our briefs could have fallen under' the commissioner's observation. 'There is not a *scintilla* of evidence to the contrary, and yet the honorable commissioner assumes,' etc., and 'in very euphuistic language says,' etc.: 'A more disingenuous and misleading statement of the evidence could not well be made.' 'It is substantially * * * untrue and unwarranted.' 'The

decision * * * seems to us to be a travesty of the evidence.'" This is the exact language which the Supreme Court of California, in that opinion, found to have been contained in the brief and petition presented by the attorney to the Court in that case for a rehearing, upon which it was held by the Court that the counsel draughting the petition was guilty of contempt, committed in the face of the Court, notwithstanding a disavowal of disrespectful intention. The Court distinctly says: "These disclaimers by the respondent we accept as true, so far as it is possible to do so without giving a constrained construction to the language used by him in his petition for a rehearing. It may be that he acted in good faith, and without any design, wish, or expectation of committing any contempt, and we accept his explanation in palliation of the offense; but the language we have quoted from his petition for a rehearing is too plain and direct in its imputation of negligence and bad faith to authorize us in taking the disavowal of the defendant as sufficient to purge him of contempt. As was said in Re Woolley, 11 Bush, 109: 'We recognize to the utmost reasonable limit of its application the rule that a supposed contempt, consisting in mere words, which are apparently intended to be scandalous and offensive, but which are at all susceptible of a different construction, may be explained or construed by the speaker or writer, and that upon his sworn disavowal of intention to commit a contempt, proceedings against him must at once be discontinued. But this rule does not control where the matter explained or written is of itself necessarily offensive and insulting. In such a case the disavowal of an intention to commit a contempt may tend to excuse, but it cannot and will not justify. the act. *People v. Freer,* 1 Caines, 485. An intention to be offensive may be disavowed, and the particular language to make the charges and imputations may be withdrawn, but the effect of the paper or publication, the ideas conveyed, the charges and imputations made, may remain.'" Notwithstanding, in that case a disclaimer by the attorney who filed that paper, of the strongest character, the

Court proceeded to adjudge him guilty of contempt, and assessed a fine upon him of $250 as a judgment for his contumacy. In this case the Court has adjudged that these parties are guilty of contempt by reason of the fact that the language of the paper brought into Court by them, and read to the Court, was of itself a contemptuous proceeding. It was one that this Court could not pass by and maintain its dignity and standing as a Court before the community. It has been truly said that the dignity of the Court is its life, its vitality, and that the Court, in the right of self-defense, is bound to protect itself from the assaults of persons who do not preserve that respect that the laws of the country require they should; nor, as supposed by counsel at the bar, is the right of this Court to punish for contempt confined to the cases mentioned in the statutes of the Territory, but it is a right which has at all times existed in Courts by common law, both in England and America. It is a common-law right; it is a right which the Court, independent of any statute upon the subject, must exercise, or it would be powerless to defend itself against the assaults of the malicious. These remarks are made, not so much to be applied to the defendants in this case, as to assert the doctrine once for all that Courts established by the Government have the right, and will exercise the right, to protect themselves in the orderly and proper administration of the laws which they are called upon to administer in the exercise of their jurisdiction. As before stated, the judgment of this Court, as found in its opinion of a former day, is entirely satisfactory, and a further examination of the authorities has tended to strengthen the Court in the opinion there rendered. We are relieved, however, of the unpleasant duty of administering any severe punishment to these defendants, for the reason that their counsel have not only made for them an open, manly, and frank disclaimer, but the have now, upon the hearing, come into Court and asked that they be allowed to withdraw the paper containing the language which was found to be offensive, and by this to express their good faith when they say that they did not intend any contempt

by the paper. We are glad to say that this proceeding
has ended in a manner much more agreeable to the Court
than if we had been compelled, as we should have been had
the case taken a different turn, to assess upon these de-
fendants a severe penalty in vindication of the law. Their
disclaimer and motion for withdrawal of the paper are
accepted by the Court, as before said, as made by them in
good faith, and they are allowed to withdraw from the
records in this cause the paper which they have read
to the Court, and on account of which they were adjudged
to be in contempt. We feel, however, that under all
the circumstances, it is but right and proper that they
should pay the costs of this proceeding in contempt
against them, and a decree will be entered directing that
they pay such costs, and that execution issue therefor.

SANDFORD, C. J., and HENDERSON, J., and BOREMAN, J.,
concurred.

Thereupon the costs were assessed against the school
trustees, and many persons having asked the privilege of
paying the fine assessed against them, it was permitted to
be paid by a public subscription, with numerous con-
tributors.